607 So.2d 1197 (1992)
Jimmie GRIFFIN, a/k/a Jimmy Griffin
v.
STATE of Mississippi.
No. 90-KA-1344.
Supreme Court of Mississippi.
September 24, 1992.
*1198 Sam Clifton, Cleveland, for appellant.
Michael C. Moore, Atty. Gen., John R. Henry, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before ROY NOBLE LEE, C.J., and PITTMAN and McRAE, JJ.
PITTMAN, Justice, for the court:
Jimmie Griffin a/k/a Jimmy Griffin and Michael G. Clark were indicted by the Bolivar County Grand Jury on October 23, 1990, for the September 15, 1990, burglary of the Crockett Food Mart in Cleveland, Mississippi. Griffin, having two prior convictions for burglary, was also indicted as *1199 an habitual offender under Miss. Code Ann. § 99-19-81 (1972). A jury trial on charges against Griffin and Clark was held on December 17, 1990. The jury returned a verdict of not guilty on the charges against Clark. The jury returned a verdict of guilty on the charges against Griffin. Aggrieved by the guilty verdict, Griffin has appealed to this Court assigning several errors. Finding no reversible error, this Court affirms.

I.
Crockett Food Mart at 1024 South Chrisman and on the corner of Wade Grove Street in Cleveland, Mississippi, was burglarized in the early morning hours of September 15, 1990. Jimmie a/k/a Jimmy Griffin and Michael Clark were charged with the crime.
Eddie Lee "Sleepy" Crockett, owner of Crockett Food Mart, closed his store at 1:00 a.m. on September 15, 1990. Only one of the three outside lights was turned on. He returned to the store to check things at 2:10 a.m. Crockett drove around the store. No outside light was shining, and Crockett assumed that the bulb had blown.
Cheewautha Lee, a resident of South Chrisman, living seven or eight houses south of the store, was walking south on Chrisman at 3:00 or 4:00 a.m. Lee had been to B's Club north of the store on Chrisman. She passed the store and heard pop bottles falling. The sound came from inside the store. Lee passed Willie Earl Coleman, who was walking north on Chrisman. She told him, "There's somebody in the store." Coleman told her, "Yeah, I'm going that way and I'll see `cause I think I saw something the first time I passed through there." Lee went home.
Sometime after 2:00 a.m. Coleman then decided to walk down the street to see if the B & L Lounge was open. Coleman passed the store on his way to the B & L. As he passed, he noticed a "flick" of light inside the store. Coleman continued to walk toward B & L. When he got to B & L, it was closed. He turned around and headed back to his home. He passed Lee. As Coleman passed the store a second time, he noticed another "flick" of light and realized that it was a cigarette lighter. Coleman hid beside the church, across the street from the store, on the corner of Chrisman and Wade Grove. He waited three or four minutes. Coleman could not see the store, but soon saw two men, whom he assumed had just left the store, crossing the street and walking away from the store. Coleman recognized Michael Clark, but did not recognize the other man. He later identified Griffin as the other man he saw that night. The two men were each carrying brown paper grocery sacks. Coleman followed the two men at a safe distance as they walked away from the store for a block or two.
Officer E. Bruce Gresham was the first officer called to the scene of the burglary the morning of September 15, 1990. When Gresham arrived, he was met by Dorothy Marshall, an employee of the store who had called the police when she discovered the break-in. Investigator George Serio of the Cleveland Police Department was called to the scene. He found a hole in the front door where a panel had been knocked out, cartons of cigarettes and loose cigarettes scattered on the floor, and store items pulled from the shelves. A meat cleaver was impaled in the pay phone money box and had been used to pry the phone open.
Crockett returned to his store between 7:30 and 8:00 a.m. on September 15th to find the business ransacked and Serio with other policemen investigating. Crockett noticed that the video machines had been broken into and that the alarm system had been unplugged. Crockett told Serio that missing items included wieners and lunchmeat from the meat counter, chewing gum, four cases of beer, two cartons of chewing tobacco, seventeen or eighteen cartons of cigarettes, cigarette lighters, an ice cooler chest, and money. Crockett noticed that the safe had been broken off of the floor board and that the meat cleaver was not hanging where he kept it on the wall behind the meat box. The scene was processed for fingerprints. Fingerprints were "lifted" from a safe, the knife that was stuck in the phone, and a carton of *1200 cigarettes. Serio investigated a vacant house located across the street from Crockett Food Mart. Inside the vacant house, Serio found a large ice cooler, some beer, and a carton of cigarettes. Crockett identified the items as some of the items taken from his store. Fingerprints were also "lifted" from two beer cans found either in the store or in the vacant house.
Later in the morning of September 15, after police had investigated the break-in, Coleman talked to Johnny Crockett, brother of Eddie Crockett, and told him what he had seen. Coleman told Johnny Crockett that he didn't want his name involved. Johnny Crockett contacted Serio. Serio decided to question Michael Clark and Jimmie Griffin. Serio and Officer McKinley Blockett went to the home of Cornelius Clark, Michael Clark's grandfather, where Michael Clark also lived. Michael Clark was not home, but Cornelius Clark gave Serio and Blockett consent to search the premises. In a storage building connected to the back of the house, Serio found two paper sacks containing cartons of cigarettes, money bills totaling $177, change totaling 55¢, little cigarette lighters, and food stamps. Cornelius Clark testified that the lock on the storage building was broken and that anyone could get into the storage room. Cornelius Clark also testified that seven people, including himself, lived at his home.
Serio continued to look for Michael Clark. Later the same morning, Serio found Michael Clark near the Clark residence. He also picked up Jimmie Griffin and took both men to the police station for questioning. Serio wanted to question Leroy Birge also. Serio spoke with Birge, and Birge voluntarily went to the police station the same morning for questioning. Birge was fingerprinted, and his home was searched. Serio and other officers determined that Birge was not involved and released him. After questioning Griffin, Serio released him because there was no evidence directly linking Griffin to the burglary.
Lee and Coleman discussed the break-in. Lee made a statement to the police on October 4, 1990. Lee told Serio that Coleman had told her not to give his name to the police and that Coleman had received a reward from one of the Crocketts. Coleman denied receiving a reward. Coleman never voluntarily reported what he had seen to the police. Serio eventually tracked Coleman down, and Coleman gave a statement to the police on October 4, 1990.
Griffin's fingerprints were sent to the Mississippi Crime Lab along with fingerprints lifted at the crime scene. Lonnie Arinder, a fingerprint expert employed by the Mississippi Crime Lab, examined the fingerprints taken at the crime scene and Griffin's fingerprints. He determined that the crime scene fingerprints and Griffin's fingerprints were the same. On October 16, 1990, the Mississippi Crime Lab contacted Serio and informed him that Griffin's fingerprints matched fingerprints from the crime scene. A warrant was issued for Griffin's arrest. He was arrested later that day.
Twenty-year-old Michael Clark testified on his own behalf at trial. According to Michael Clark, he spent most of the day with Griffin on September 14. The two young men are friends and cousins and "hang out" with each other often. The last time he saw Griffin was at 12:30 a.m., September 15, when Griffin left the B & L. Michael Clark claimed that he went to the B & L Lounge on the evening of the break-in, that he left around 12:50 a.m., and that he went home alone and went to bed. Michael Clark testified that he arrived at his home around 1:30 a.m. Michael Clark said he did pass by Crockett's Food Mart on his way home, but he did not enter the store. According to Michael Clark, he went to Griffin's home early the next morning.
Griffin did not testify on his own behalf at the trial. After deliberating 55 minutes, the jury returned a not guilty verdict in favor of Michael Clark and a guilty verdict on the charges against Griffin.

II.
Griffin contends that the verdict of the jury was contrary to law and against *1201 the overwhelming weight of the evidence. In Burge v. State, 472 So.2d 392 (Miss. 1985), this Court stated that all evidence, even that which does not support the State's case, must be considered in the light most favorable to the State. Id. at 396. See also May v. State, 460 So.2d 778, 781 (Miss. 1984). "[T]his court must accept as true the evidence which supports the verdict." Spikes v. State, 302 So.2d 250, 251 (Miss. 1974). The State must be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. Glass v. State, 278 So.2d 384, 386 (Miss. 1973). See also Johnson v. State, 452 So.2d 850, 853 (Miss. 1984); Winters v. State, 449 So.2d 766, 771 (Miss. 1984); Bullock v. State, 447 So.2d 1284, 1286-87 (Miss. 1984); Dickerson v. State, 441 So.2d 536, 538 (Miss. 1983); Gandy v. State, 438 So.2d 279, 285 (Miss. 1983).
Griffin contends that the verdict was against the overwhelming weight of the evidence. When viewed in the light most favorable to the State, however, the evidence was more than sufficient to convict Griffin of burglary.
On the night of the burglary, Willie Earl Coleman testified that he saw a flicker of light inside the store as he was walking by. He walked down the street and waited approximately five minutes to see if anybody left the store. Coleman stated that he saw Griffin and Clark walk across the street with two grocery bags. Furthermore, Lonnie Arinder, a fingerprint expert from the Mississippi Crime Lab, testified that Griffin's fingerprints matched those lifted from the scene. Griffin's fingerprints were found on a safe in the store, on a meat cleaver that was stuck in a pay phone on the wall, and on a package of cigarettes found on the floor.
Griffin's contention that the evidence was insufficient to support the verdict fails for the same reasons. Griffin maintains that he was convicted solely on the fingerprint evidence. In McLain v. State, 198 Miss. 831, 24 So.2d 15 (1945), the defendant was convicted with grand larceny of an automobile. This Court reversed the conviction holding:
In the case before us here the sole and only proof against appellant consists of a thumb-print on the rear-view mirror, which is conclusive evidence of his identity, and that he had been in the car for some purpose; but evidence of identity and of presence alone is not equivalent to evidence of guilt of a particular crime, especially where several crimes could have been committed as to this car, but as to which a certain charge was made. The thumb-print here was not declaratory ... of the nature of the crime, since it was not aided by other evidence identifying the particular crime, and did not exclude other crimes.
No witness testified to having seen appellant in Clarksdale on the night the car was stolen, or on the day it was recovered; and, as stated, there is no evidence in the record of any kind as to when, or under what circumstances, this print was made on the rear-view mirror.
It is therefore, our judgment that thumb print alone was not sufficient to establish the specific and definite crime of grand larceny, under the circumstances of this particular case.
Id. at 836-37, 24 So.2d 15.
In the case at hand, however, the State produced the eyewitness testimony of Coleman. Coleman's testimony along with the fingerprint testimony was sufficient to support the jury's verdict. In Williams v. State, 210 So.2d 780 (Miss. 1968), Miss Robbins's home was burglarized. The defendant's palm print was found on the inside of a windowsill and he fit the description given by Miss Robbins. This Court held that this evidence was sufficient to support the verdict of the jury. Id. at 783. Williams, however, was reversed and remanded on other grounds.
This assignment of error is without merit.

III.
Griffin contends that the lower court erred by allowing the State to exercise all five of its peremptory challenges to exclude black veniremen from the jury panel. The appellant is a member of the black *1202 race. The State exercised its first three peremptory strikes against three potential black jurors. The defense objected on the basis of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
Batson was decided on equal protection grounds and holds that although a defendant does not have a right to have members of his own race on a jury, he does have "the right to be tried by a jury whose members are selected pursuant to non-discriminatory criteria." A defendant may make a prima facie showing of purposeful racial discrimination in selection of the venire by relying solely on the facts concerning its selection in his case. A defendant may establish a prima facie case of purposeful discrimination in selection of the jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial.
Under Batson, the defendant must show (1) "that he is a member of a cognizable racial group," (2) "that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race," and (3) "that these facts and other relevant circumstances raise an inference that the prosecutor used that practice to exclude veniremen from the petit jury on account of their races" which is an "inference of purposeful discrimination." Id. at 96, 106 S.Ct. at 1723; Davis v. State, 551 So.2d 165, 170 (Miss. 1989), cert. den'd 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 797, rehrg. den'd 495 U.S. 953, 110 S.Ct. 2221, 109 L.Ed.2d 546 (1990); Taylor v. State, 524 So.2d 565, 566 (Miss. 1988).
If the trial court, considering all relevant circumstances, such as a pattern of exercising strikes from the venire on the basis of race and the nature of the prosecutor's questions and statements on voir dire, decides that the showing creates a prima facie case of discrimination, then the burden shifts to the State to come forward with a neutral explanation for each of the challenges that must be related to the particular case being tried. Batson, 476 U.S. at 97-98, 106 S.Ct. at 1723-24; Davis, 551 So.2d at 170; Chisolm v. State, 529 So.2d 630, 632-33 (Miss. 1988); Johnson v. State, 529 So.2d 577, 583 (Miss. 1988); Dedeaux v. State, 519 So.2d 886, 888 (Miss. 1988); Lockett v. State, 517 So.2d 1346, 1349 (Miss. 1987), cert. den'd 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895, rehrg. den'd 487 U.S. 1250, 109 S.Ct. 13, 101 L.Ed.2d 963 (1988).
The pivotal query then is whether the State was able to present a race-neutral explanation for each of the peremptory strikes. The first peremptorily challenged juror according to the State, kept nodding off during voir dire. In Lockett, this Court listed in an appendix cases from other jurisdictions which provided racially neutral reasons for striking a potential juror. Id. at 1356-57. Several of the cases listed inattentiveness as a valid racially neutral reason for striking a juror. Id. In Woodward v. State, 533 So.2d 418 (Miss. 1988), this Court held that "the trial judge did not err in excusing the sleeping juror or the tardy juror who took numerous medications, and who gave incoherent and contradictory answers." Id. at 424.
The second peremptory, challenge by the State was used on a juror who had been in jail for DUI and had problems with the Mound Bayou Police Department according to a deputy sheriff in Bolivar County.
The third peremptory challenge was to a juror whom the State said was sleepy, young and unemployed. The State did not think that he would have been a conservative juror on behalf of the State. Once again, the State's reasoning was sufficient according to Lockett. Id.
A race-neutral showing is not a difficult showing. This Court has held that a prosecutor's statement that he had peremptorily challenged a venireman because of the manner in which he was dressed and because he was unmarried and did not have a stake in the community was sufficient to show that the use of the peremptory challenge was not based on race. Bradley v. State, 562 So.2d 1276, 1282-83 (Miss. 1990). In Benson v. State, 551 So.2d 188 (Miss. 1989), this Court found that a prosecutor's explanation for the exercise of peremptory challenges against blacks were race-neutral *1203 where the prosecutor believed that one prospective juror was related to someone who had been tried for a felony and one prospective juror had unsteady work. The explanation need not rise to the level of justifying exercise of a challenge for cause. Id. at 192 (citing Lockett, 517 So.2d at 1352).
The State also struck two more potential black jurors. One was struck because he had family members who had been convicted of crimes, and the other was struck because she knew the defendant and defense counsel. The reasons provided by the State were race-neutral.
Finally, Griffin contends that the lower court erred in refusing to allow him to question the individual jurors in an attempt to rebut the allegations made by the State. "The defense may rebut the neutral nonracial explanation for peremptory challenges... ." Davis, 551 So.2d at 172. In denying defense counsel's request, the lower court judge stated:
[T]he Court has accepted the statements of the district attorney's office for their reasons for doing so and considers them valid reasons from a trial court standpoint. I am not going to call these jurors in to ask them whether or not what they say is true or not. We could prolong this trial into next week by asking people whether or not something like this is true or not.
We recognize the trial court's fear of having mini-trials for each potential juror on the basis of Batson. "The trial judge has the duty of conducting an orderly trial... . It is also his duty to see that the court's time is used economically." Turner v. State, 220 So.2d 295, 297 (Miss. 1969) (citation omitted). Nonetheless, we remind trial judges of the danger in failing to allow counsel to place sufficient evidence in the record either proving or rebutting Batson issues. We also suggest to the District Attorneys that they give a full and complete response when their peremptory challenge is subjected to a Batson review. Race-neutral explanations satisfy Batson, but only when they are not a smokescreen behind which the state is, in reality, exercising discriminatory challenges. While the evidence before us is sufficient to deny the appellant's alleged Batson error, we would be more comfortable doing so had the trial judge allowed defendant's counsel to question the potential jurors. It does not appear that allowing the defendant to question the few challenged jurors individually, strictly to provide proof on the Batson issue, would have taken up so much time as to disrupt the trial and waste the court's time. Similarly, we caution prosecutors about using alleged reports of criminal wrongdoing as a basis for striking a juror without substantiating the allegation either through questioning the juror or outside proof.
Nonetheless, under the current law the prosecution provided sufficiently valid reasons for challenging the potential jurors at issue. This assignment of error is without merit.

IV.
Finally, Griffin contends that the lower court erred in sentencing him as an habitual offender. In 1988, when Griffin was only sixteen years old, he was convicted on two separate counts of burglary. At the habitual offender hearing, Griffin testified that he had been certified as an adult. He received a sentence of seven years with four years suspended on each conviction.
The State provided the lower court with certified copies of the convictions from the circuit clerk's office in Bolivar County. At the hearing, Griffin's counsel requested that he be provided with a copy of the document certifying Griffin as an adult in the 1988 proceedings. Although the State alleged at the hearing that the defense had been provided with such documentation, Griffin contends on appeal that he never received any such documentation. Griffin, however, fails to cite any authority stating that this constitutes reversible error. The State contends that even if failure to produce a copy of the certification was error, it is harmless in this case because the defendant admitted that he had been certified as an adult.
*1204 The lower court judge made the following statement concerning the certification document:
[I]f it can't be found  if it is not available or if it is not in existence, of course, there would conceivable [sic] be a right to a post-trial hearing on it. But we do know that the defendant was convicted in the Circuit Court of the Second Judicial District on the 15th day of June, 1988, for two separate charges of burglary of a building other than a dwelling. And I think the Court could assume that this was legally and validly done. It was never appealed, or if it was appealed, it was affirmed. If it was a guilty plea, no post-trial hearing was attempted at that time. But you certainly would have a right to have the record and if you found anything erroneous in it, you would have the right to take whatever action the law allowed with regard to that.
(emphasis added).
Finally, Griffin contends that the lower court's ruling as to the habitual offender status should be reversed because the previous convictions occurred on the same day and were based on guilty pleas. Rushing v. State, 461 So.2d 710 (Miss. 1984) and Presley v. State, 498 So.2d 832 (Miss. 1986), however, are directly on point and provide no relief for Griffin. "Appellant's argument that the statute does not apply where the convictions, though arising out of separate incidents, occurred on the same day is completely without merit and should be rejected." Rushing, 461 So.2d at 713. "[T]he lower court was under no duty to inform a defendant, who wished to enter a guilty plea, that the conviction could later be used to enhance future punishment if he committed other crimes." Presley, 498 So.2d at 833.
This assignment of error is without merit.

CONCLUSION
The evidence presented by the State was sufficient to support the verdict of the jury. The verdict was not against the overwhelming weight of the evidence. There was no violation of Batson, and Griffin was properly sentenced as an habitual offender. Therefore, this conviction and sentence are affirmed.
CONVICTION OF BURGLARY AS A HABITUAL OFFENDER AND SENTENCE OF SEVEN (7) YEARS IN THE MISSISSIPPI DEPARTMENT OF CORRECTIONS. AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, SULLIVAN, BANKS and McRAE, JJ., concur.