# IN THE COURT OF APPEALS
# OF THE
# STATE OF MISSISSIPPI
## NO. 1998-KA-00996-COA

**AUNDRA LAVELL RIDDLEY**                                            **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                            **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 02/12/1997 |
| TRIAL JUDGE: | HON. L. BRELAND HILBURN JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | VICKI LACHNEY GILLIAM |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:  JOLENE M. LOWRY |
| DISTRICT ATTORNEY: | EDWARDS J. PETERS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | 02/12/1997: MURDER: SENTENCED TO SERVE A TERM OF LIFE IN THE CUSTODY OF THE MDOC |
| DISPOSITION: | AFFIRMED - 04/20/99 |
| MOTION FOR REHEARING FILED: | 05/03/99 - AFFIRMED - 08/24/99 |
| CERTIORARI FILED: | ; granted 12/09/99 |
| MANDATE ISSUED: | |

ON MOTION FOR REHEARING

EN BANC

THOMAS, P.J., FOR THE COURT:

¶1. On Motion for Rehearing, the original opinion is withdrawn, and this opinion is substituted. Aundra Lavell Riddley appeals his conviction of murder, raising the following issues as error:

**I. THE TRIAL COURT ERRED BY ALLOWING PLAIN ERROR TO OCCUR WHEN THE PROSECUTION IMPROPERLY COMMENTED DURING CROSS-EXAMINATION OF APPELLANT AND CLOSING ARGUMENT ON APPELLANT'S RIGHT TO COUNSEL.**

**II. THE TRIAL COURT ERRED BY ALLOWING PLAIN ERROR TO OCCUR WHEN THE PROSECUTION INTRODUCED EVIDENCE SUGGESTING THAT APPELLANT HAD COMMITTED OTHER UNRELATED CRIMES AND BAD ACTS.**

**III. OTHER INSTANCES OF PROSECUTORIAL MISCONDUCT WERE UNFAIRLY PREJUDICIAL AND, AS A RESULT, THE CUMULATIVE EFFECT OF THE IMPROPER COMMENTS DENIED APPELLANT A FUNDAMENTALLY FAIR TRIAL.**

**IV. THE TRIAL COURT ERRED BY FAILING TO GRANT APPELLANT'S MOTION FOR DIRECTED VERDICT AND MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT AND/OR THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE.**

**V. DURING HIS TRIAL, APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL.**

¶2. Finding no error, we affirm.

### FACTS

¶3. Around 7:00 a.m., on the morning of February 26, 1996, Bobbie Hawkins was getting her four children ready for school at her home on Hooker Street in Jackson, Mississippi. As she did every school morning, Hawkins was staring out the window looking for the Martin Head Start van which would drive her children to school. As she watched out the window, Hawkins noticed Aundra Riddley, someone she recognized from the neighborhood, standing on the hill across the street with two other men. As Hawkins watched, Riddley pulled a gun and began shooting at the feet of one the men standing there, later identified as the victim David Lashawn Clemmons. Clemmons ran down the hill with Riddley in close pursuit and still firing his gun. Hawkins saw Riddley shoot at the feet of Clemmons four or five times and saw Riddley shoot an additional seven or eight times as Clemmons ran away. Hawkins never saw Clemmons with a gun. Hawkins called 911 and said that Riddley shot a man on the street.

¶4. On the same morning, David Shaw, an employee of Mississippi Power and Light, was driving his truck down Hooker Street. Shaw saw Clemmons staggering on the sidewalk and saw him collapse into the street. Shaw was not sure what was the matter with Clemmons and thought maybe he was drunk. Shaw pulled his truck next to Clemmons and rolled down his window. Clemmons told Shaw he had been shot and to call an ambulance. Shaw radioed in and had his dispatcher call the police and an ambulance. Shaw circled the block and returned to give aid to Clemmons. Shaw never saw Clemmons with a gun nor did he see a gun in the proximity of the victim.

¶5. Clemmons had been shot a total of six times causing fourteen separate wounds. Clemmons was shot twice in the back, once on the side, once in the back of the leg, and twice on the front of his left leg. Clemmons eventually died of massive bleeding. Riddley was indicted for the murder of Clemmons. At trial Tammy McLin, Riddley's girlfriend, Franzetta McLin, Tammy's sister, and Riddley all testified on the defense's behalf.

¶6. Tammy testified that on the night before the shooting a barbecue was held at the McLin's home on Hooker Street. Tammy testified that on that night Clemmons appeared to be selling drugs on the street in front of the McLin home. Tammy's mother, Betty McLin, asked Clemmons to move, and he "got smart" with her. Tammy also testified that on the morning of the shooting Clemmons and another boy stopped by the house, and Clemmons exchanged words with Riddley. On direct examination, Tammy stated that

Clemmons and Riddley began to exchange gunfire, but she could not tell who fired first. However, on cross-examination Tammy testified that Clemmons fired first, and Riddley acted in self-defense. Tammy also stated that once Clemmons fell down, a group of boys crowded around him. Tammy did not know what happened to Clemmons's gun.

¶7. Franzetta testified that on the morning of the shooting she, Tammy, and Riddley were cleaning up the yard from the party. Franzetta stated that Clemmons came by and said he was going to "get" Riddley. She further testified that Clemmons left and returned shortly with a friend. Franzetta stated that Clemmons left and returned a third time brandishing a gun. Franzetta testified that Clemmons fired first, and Riddley only returned fire. Franzetta testified that once the shooting started that Clemmons began to run away but kept firing his gun. Franzetta also testified that a group of boys crowded around Clemmons after he fell.

¶8. Riddley, testifying in his own defense, stated that Clemmons was the leader of a gang. Riddley testified that he was harassed by Clemmons and his gang in the past, and again on the night before the shooting, he and Clemmons had a verbal confrontation after Clemmons exchanged words with Betty. The next morning, according to Riddley, Clemmons showed up again threatening "to get" Riddley. Riddley stated he went inside and later when he came back out Clemmons showed up again, this time with a gun in his hands. Riddley testified that Clemmons shot first, and he returned fire in self-defense. Riddley testified that he did not remember what he did with his gun. Riddley further testified that he hailed a cab and went to the Oasis Motel, frightened of retaliation by Clemmons's gang. Upon realizing that Clemmons had died, Riddley stated he contacted his lawyer, and together, they went to the police.

¶9. After a lengthy cross-examination of Riddley, the State called Officer J.K. Webb in rebuttal, who testified that he went to the McLin home the morning of the shooting, and no one was able to offer any information about the shooting because they had all been asleep. Following deliberations, the jury found Riddley guilty, and he was thereafter sentenced to serve a term of life imprisonment. Feeling aggrieved, Riddley perfected this appeal.

## I.

**THE TRIAL COURT ERRED BY ALLOWING PLAIN ERROR TO OCCUR WHEN THE PROSECUTION IMPROPERLY COMMENTED DURING CROSS-EXAMINATION OF APPELLANT AND CLOSING ARGUMENT ON APPELLANT'S RIGHT TO COUNSEL**.

¶10. Riddley argues that during his cross-examination by the State and during closing argument, the prosecution made improper comments regarding his constitutional right to counsel. Riddley claims the prosecution repeatedly used the fact that he exercised his Fifth Amendment right to have counsel present during custodial interrogation, and that he exercised his Sixth Amendment right to counsel in a criminal prosecution, as a basis for an inference of guilt, impermissibly penalizing him for exercising these rights. Although no contemporaneous objections were made to any of the alleged improper comments, Riddley urges us to consider the comments as plain error and reverse his conviction and sentence.

¶11. Although there are no specific Mississippi cases dealing with this issue, in support of his argument Riddley urges us to extend the rationale of those cases in which our supreme court has held under *Doyle v.*

*Ohio*, 426 U.S. 610, 611 (1976), that the prosecution may not use at trial the fact that the accused claimed his privilege to remain silent in the face of accusations. *See Johnson v. State*, 596 So. 2d 865, 868-69 (Miss. 1992); *Austin v. State*, 384 So. 2d 600, 601 (Miss. 1980). Riddley also urges us to look to *United States v. McDonald*, 620 F.2d 559, 564 (5th Cir. 1980), where the Fifth Circuit, even though there was no contemporaneous objections, reversed a defendant's conviction holding:

> Comments that penalize a defendant for the exercise of his right to counsel and that also strike at the core of his defense cannot be considered harmless error. The right to counsel is so basic to all other rights that it must be accorded very careful treatment. Obvious and insidious attacks on the exercise of this constitutional right are antithetical to the concept of a fair trial and are reversible error.

¶12. Riddley also cites to *Bruno v. Rushen*, 721 F.2d 1193, 1194 (9th Cir. 1983), in which the Ninth Circuit examined an issue where the prosecutor in opening argument implied a witness had changed her testimony after talking to the accused's attorney, and then in summation the prosecutor inferred to the jury that the fact the accused hired counsel was in some way probative of the defendant's guilt and "defense counsel in criminal cases are retained solely to lie and distort the facts and camouflage the truth in an abominable attempt to confuse the jury as to their client's involvement with the alleged crimes." *Id.* The Ninth Circuit, noting that there was not a shred of evidence supporting either claim held:

> The improper remarks were made at an important stage of the trial and were extensive. They were not accidental but calculated to wrongly impute guilt to the defendant. These comments "strike at the jugular" of the defendant's story, *United States v. McDonald*, 620 F.2d at 563, and they were not withdrawn upon objection. The cumulative effect of the prejudice can reasonably be regarded as possibly affecting the verdict and thereby denying the defendant a fundamentally fair trial. Accordingly, we find the error not harmless beyond a reasonable doubt, and affirm the grant of the writ of habeas corpus.

*Id*. at 1195.

¶13. Finally, Riddley cites to *Arthur v. State*, 575 So. 2d 1165, 1180 (Ala.Crim.App. 1990), in which the Alabama court accepted the reasoning in *McDonald* and *Bruno* holding "[a]s silence in the face of accusation cannot be attributed to guilt, hiring an attorney cannot be indicative of guilt." Riddley asks us to accept the reasoning of these courts, recognize the plain error caused by the prosecution's comments, find that the comments are not harmless, and reverse his conviction and sentence.

¶14. Riddley cites to the following exchanges during his cross-examination by the State which he alleges were improper comments on his right to counsel:

> Q. *So the first person you called was this defense lawyer; is that right?*
>
> A. (Witness nods head affirmatively.)
>
> Q. Right?
>
> A. Yes, sir.

Q. All right. So you called your lawyer, and you told him what had happened; isn't that right?

A. Yes, sir.

Q. *Well, when did you call the police?*

A. When did I call the police? Me and my lawyer went to the detective's office and turned myself in.

Q. How many days did you stay at the hotel before you called the police?

A. I never called the police.

Q. *How many days did you stay there before you called your lawyer?*

A. Whenever I seen -- the day I seen it on the news. That's when I called my lawyer.

. . . .

Q. *Did you ever come back and talk to the police, Mr. Riddley?*

A. No, sir.

Q. *Did you ever call the police and tell them what happened?*

A. No, sir. After I found out what had happened, that it was more than just a, you know, just shooting or something like that, that's when I got in touch with my attorney.

Q. What do you mean? You learned that you had killed somebody?

A. Yes, sir. Once I learned that right there I got in touch with my attorney and told him the circumstances of the case.

Q. You learned the police were looking for you, didn't you?

A. I learned -- once I seen it on the news that he was shot, they already -- they said that they were looking for somebody, and they didn't even have -- I don't know if they had my name or not. I just came. I got my lawyer and told my lawyer what had happened and turned myself --

Q. -- Well, you didn't call him and tell him where you were and that you were scared of somebody, did you?

A. Who? My lawyer?

Q. Uh-huh.

A. I told my lawyer --

Q. -- *Did you call the police and tell them that you were afraid, come get me?*

A. *No. I got my lawyer.* I told my lawyer. You know, I asked my lawyer, you know, what he think that we should do, you know, because I said I want to turn myself in, *but I want to turn myself in*

*with a lawyer so it wouldn't be harassment and stuff like that and --*

Q. *-- Do you get harassed often by the police?*

. . . .

Q. *-- Why were you withholding information from the police?*

A. My lawyer told me to answer what they asked. Anything they don't ask we will bring it up in the preliminary hearing, and it will be better for me.

Q. *So let's give them some information but not give them all the information; is that right?*

A. Let's give them what they asked. That's what my lawyer told me to do.

Q. *Only what they ask and don't volunteer any information; is that right?*

A. I gave them exactly what they asked, sir.

Q. All right. *Mr. Marshall* [trial counsel] *was the first person you called, right?*

. . . .

Q. *Do you call your lawyer every time you get scared?*

A. I call my lawyer when I need my lawyer.

Q. *And you felt you needed your lawyer two days after you killed Mr. Clemmons, didn't you?*

A. Because I seen it on the news that he had died. I knew I needed a lawyer.

Q. *You knew you needed a lawyer then, didn't you, because you knew the police were looking for you?*

A. We came and turned -- I turned myself in to the police.

Q. You turned yourself in, didn't you?

A. Yes.

Q. That's after you saw the police were looking for you on television?

A. Yes. After -- I don't even know if they said they were looking for me or not. After I seen he was dead on the television I turned myself in. I called my lawyer and asked my lawyer, you know, what's the procedure, what he thinks we should do to do it, and we went down there. We took care -- we turned -- I gave a statement. We gave the statement, and Mr. Lee said that by me turning myself in, there would be a good chance that I have a bond since I turned myself in and didn't try to run from them or nothing like that.

Q. Are you finished? Are you through?

(emphasis added).

¶15. Riddley also cites to the following comment made by the prosecution during closing argument:

> This guy, who when he went -- no job. Just happened to have enough money for cab fare for the five dollar trip and the hotel fee, *this 18-year-old who when he realizes that he's killed a man doesn't call his mother. He never called his mother. Who did he call? He called his lawyer.* And his lawyer said, we'll turn you in, he said, so that you'll have a chance of getting out on bond because if you run, you won't get a bond when they catch you, and they're going to catch you, and that's why he turned himself in.

(emphasis added).

¶16. As Riddley correctly points out, at no time was any contemporaneous objection made to any of these comments. Our supreme court has delineated that where no objections are raised at trial and it is alleged that the prosecutor made improper comments in argument before the jury as well as while examining witnesses, a defendant must rely on plain error to raise the assignment on appeal. *Watts v. State*, 96-DP-01030-SCT (¶17) (Miss. 1999). Thus, this issue is procedurally barred from review absent plain error.

¶17. We only address "issues on plain error review when the error of the trial court has impacted upon a fundamental right of the defendant." *Sanders v. State*, 678 So. 2d 663, 670 (Miss. 1996). "It has been established that where fundamental rights are violated, procedural rules give way to prevent a miscarriage of justice."*Gray v. State*, 549 So. 2d 1316, 1321 (Miss. 1989) (citing *House v. State*, 445 So. 2d 815, 820 (Miss. 1984)). We hold that the prosecution's cross-examination and closing argument references to Riddley's exercise of his constitutional right to counsel do not rise to such a level as to constitute plain error. Therefore, the procedural bar must stand.

¶18. *McDonald* clearly holds that in order to rise to the level of reversible error, comments on a defendant's exercise of his right to counsel must "strike at the jugular" of a defendant's story and not merely "tangentially with it." *McDonald*, 620 F.2d at 563. Riddley's entire defense rested on the fact that he allegedly acted in self-defense when he shot and killed Clemmons. The prosecution's remarks on Riddley's right to counsel in no way impugned that defense. If anything, they were merely an attack on Riddley's assertions that he fully cooperated with police, and an attack on Riddley's claim that he was afraid of Clemmons's gang. Since the comments did not "strike at the jugular" of Riddley's exculpatory story, they did not rise to a level requiring reversal.

¶19. The *McDonald* court in recognizing this distinction, gave a lengthy discussion of an earlier case, *Stone v. Estelle*, 556 F.2d 1242, 1243 (5th Cir. 1977), where the Fifth Circuit had to consider the question of references to a defendant's right to counsel. *Id*. at 562. As Riddley's case is very much analogous to *Stone*, the Fifth Circuit's discussion is repeated in full:

> In *Stone v. Estelle*, 556 F.2d 1242 (5th Cir. 1977), we affirmed the district court's refusal to grant a writ of habeas corpus to a defendant who claimed that the prosecutor at his murder trial had commented impermissibly on his exercise of his right to counsel. Stone admitted killing the victim but claimed self-defense. He testified that at the time of his arrest he was on his way to turn himself in, and he claimed that he had cooperated fully with the police. In order to refute the latter claim, the prosecutor asked the defendant about his refusal to participate in a lineup. Although the defendant

denied that he had so refused, he did say he had asked for a lawyer. During closing arguments, the prosecutor said:

Oh, he tried to cooperate with the police after he killed somebody, he sure did. . . . Don't you know if he was worried he would have come down here that night and told the police what happened. Then he wouldn't tell them anything, he wouldn't tell them anything, he had to have a lawyer. These are things you can take into consideration as far as the credibility of these witnesses. 556 F.2d at 1244 n. 5.

On appeal Stone relied on *Doyle*, supra. In *Doyle* the prosecutor had commented on the defendant's failure to tell his exculpatory story to the police at the time of his arrest. The Supreme Court held that this infringed the defendant's Fifth Amendment right to remain silent. We found the prosecutor's comment in *Stone* to be "unwarranted," but because the remarks had not "produced a trial which was fundamentally unfair so as to deny appellant due process," affirmed the denial of the application for writ of habeas corpus. We distinguished *Doyle* on the grounds that the comment in *Doyle* was used as a direct attack on the defendant's exculpatory story while the comment in *Stone* was in support of the government's theory on a merely collateral issue. We said in *Stone*:

In the present case, Stone's version of the shooting was not the subject of the impeachment inquiry. Rather, the prosecutor was attempting to challenge only the proposition that Stone had been cooperative with the police. Of course, the question of Stone's cooperativeness may have affected his credibility to the jury, but it had no bearing on his claim of self-defense, which was his exculpatory story.

That the prosecutorial questioning and comment must be directed at the defendant's essential story concerning the crime for which he is charged in order to contravene the *Doyle* rule is shown by *Doyle's* progeny in this circuit. In *United States v. Davis*, 5 Cir., 1977, 546 F.2d 583, for example, we spoke of "an apparent requirement that, to reverse a conviction, 'the prosecutor's comments str(ike) at the jugular of (defendant's) story.' " *Id*. at 594, quoting *United States v. Harp*, 5 Cir., 1976, 536 F.2d 601; cf. *Chapman v. United States*, 5 Cir., 1977, 547 F.2d 1240. *Davis* was a case in which we held that prosecutorial comment upon a defendant's failure to offer his coercion defense when he was arrested for escape did not constitute reversible error in the circumstances therein. . . . Here the issue of Stone's cooperativeness was not essential to his defense; indeed, it was unrelated to the crime charged and to Stone's story pertaining thereto. 556 F.2d at 1245.

The use made of the references to McDonald's lawyer makes this case more akin to *Doyle* than it is to *Stone*. The implication that McDonald had destroyed incriminating evidence struck at the jugular of his exculpatory story, the essence of which was that there was no evidence to destroy.

Our decision today fully extends the *Davis* distinction to cases involving comments on a defendant's exercise of his right to counsel. The dividing line of *Davis* separates comments that "strike at the jugular" of a defendant's story and those dealing only tangentially with it.

*McDonald*, 620 F.2d at 562-63.

¶20. As in *Stone*, the prosecution's manner of cross-examination of Riddley and the comments made during closing argument may have been "unwarranted" but do not rise to such a level as to have "produced a trial

which was fundamentally unfair." We do note, however, that prosecutors should exercise extreme caution whenever they comment on a defendant's exercise of a constitutionally protected right. We certainly do not condone any inference that an individual is guilty just because they hired an attorney. As the United State Supreme Court has asserted "[w]e have long recognized that "lawyers in criminal courts are necessities, not luxuries.""*Penson v. Ohio*, 488 U.S. 75, 84 (1988) (quoting *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963)).

## II.

## THE TRIAL COURT ERRED BY ALLOWING PLAIN ERROR TO OCCUR WHEN THE PROSECUTION INTRODUCED EVIDENCE SUGGESTING THAT APPELLANT HAD COMMITTED OTHER UNRELATED CRIMES AND BAD ACTS.

¶21. Riddley argues that the prosecution made improper references to other bad acts and crimes during his cross-examination and during closing argument which constituted improper character evidence, used to unfairly prejudice the jury against him. Riddley claims that the State introduced these specific bad acts for none of the purposes listed in M.R.E. 404(b). Riddley also complains that no M.R.E. 403 balancing test was performed to allow this evidence and further that no limiting instruction was given as to how this evidence was to be considered by the jury. Riddley urges us to reverse his conviction on the failure of the trial court to insure him a fundamentally fair trial.

¶22. Riddley cites to the following questions made during cross-examination: The prosecution asked Riddley if he had ever taken a gun to school; the prosecution twice asked Riddley if he had ever sold drugs; the prosecution asked Riddley if he was doing anything illegal on Summer Street the day after the shooting; the prosecution asked if Riddley had a gun in a shooting in August following the events in question; the prosecution asked Riddley if he was doing drugs the night of the barbecue before the shooting took place; the prosecution asked if Riddley had ever tried to shoot anyone before. Finally in closing argument the prosecution made the following comments:

> The defense lawyer wanted to get up here and talk to you with a straight face about the crime problem in the city of Jackson. Ladies and gentlemen, I'm going to tell you right now you're not going to solve the crime problem in the city of Jackson with this verdict. I'm not going to get up here and tell you that. But I tell you what you will do. You'll solve this crime, and you'll put this defendant where he belongs, this defendant who's been running the street, shot multiple times, shot one time that he didn't even remember and that I had to remind him of. *That's the kind of person that you're dealing with. This is the gun toting thug, not Mr. Clemmons.*

(emphasis added).

¶23. We should first note that Riddley failed to make contemporaneous objections on all but one of the comments cited. The failure to make a contemporaneous objection waives the right to raise the issue on appeal. *Ballenger v. State*, 667 So. 2d 1242, 1259 (Miss. 1995) (citing *Chase v. State*, 645 So. 2d 829, 835 (Miss. 1994); *Cole v. State*, 525 So. 2d 365, 369 (Miss. 1987); *Irving v. State*, 498 So. 2d 305 (Miss. 1986); *Cannaday v. State*, 455 So. 2d 713, 718-19 (Miss. 1984)). The one objection that was made was sustained, and no request was made that the jury should be instructed to disregard the comment. "It is the rule in this State that where an objection is sustained, and no request is made that the jury be told to disregard the objectionable matter, there is no error." *Marks v. State*, 532 So. 2d 976, 981(Miss.

1988) (citing *Simpson v. State*, 497 So. 2d 424, 431 (Miss. 1986); *Gardner v. State*, 455 So. 2d 796, 800 (Miss. 1984)). Riddley is procedurally barred from raising these issues on appeal.

¶24. Without waiving the procedural bar, even addressing this issue Riddley's argument is without merit. As with any analysis of character evidence we reiterate the general rule found in M.R.E. 404(a) that "[e]vidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion." This rule applies equally to the defendant as it does to the prosecution. This rule, however, has certain delineated exceptions. The first of which, found under M.R.E. 404(a)(1), states "[e]vidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same."

¶25. During direct examination Riddley made statements concerning his general character. These comments included the following:

> I ain't the only boy that just said they ain't gonna join their gang or whatever they want to do or sell their dope or whatever they want.

> And as young as I was, you know, I wasn't -- I ain't - you know, I ain't - well, you oughta know my record. I ain't no violent person, you know, or nothing like that, so I ain't -- beside this, I ain't never had no confrontation or nothing like that right there.

> I ain't trying to lie to the jury or nothing.

> You know, I ain't trying to lead nobody on or nothing.

> I ain't no mass murder or nothing.

¶26. In addition, Riddley stated on direct examination that Clemmons was the leader of a gang. Riddley also stated that this gang ran the area where the shooting took place, and that this gang was constantly harassing him. Riddley repeatedly claimed he was scared of this gang and further claimed that after the shooting he had gone to hide because of possible retaliation from the gang.

¶27. The above evidence attempted to show Riddley's nature as a peaceful person, and the fact he was a law abiding citizen afraid of Clemmons and his gang. Riddley attempted to portray himself as someone who would not sell drugs, was not violent, would not tell a lie, and who was scared of Clemmons and his gang. Such evidence tends to support Riddley's claim that he acted in self-defense; therefore, the evidence was proper as it was "[e]vidence of a pertinent trait of his character offered by an accused." M.R.E. 404(a)(1). As Riddley was allowed to do this under M.R.E. 404(a)(1), the prosecution was allowed to "rebut the same" under M.R.E. 404(a)(1).

¶28. Once this character evidence was properly admitted, we must look at M.R.E. 405 which defines the methodology by which this character evidence may be proved. M.R.E. 405 cmt. M.R.E. 405 prescribes that:

> (a) Reputation or Opinion. In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

(b) Specific Instances of Conduct. In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct.

¶29. M.R.E. 405(a) specifically states "[o]n cross-examination, inquiry is allowable into relevant specific instances of conduct." The State rebutted Riddley's assertions by questioning him about specific instances of his conduct. The State never attempted to prove with extrinsic evidence any of the specific instances brought out on cross-examination. The State never went beyond properly rebutting Riddley's testimony on cross-examination only; therefore, no error occurred.

¶30. One final note. Our supreme court has held "that wherever 404(b) evidence is offered and there is an objection which is overruled, the objection shall be deemed an invocation of the right to [M.R.E.] 403 balancing analysis and a limiting instruction. The court shall conduct an [M.R.E.] 403 analysis and, if the evidence passes that hurdle, give a limiting instruction unless the party objecting to the evidence objects to giving the limiting instruction." *Smith v. State*, 656 So. 2d 95, 100 (Miss. 1995). As shown above this character evidence was introduced under M.R.E. 404(a)(1) and not M.R.E. 404(b). Furthermore, no objections were made against the comments. Therefore, Riddley is mistaken to claim that an on-the-record M.R.E. 403 analysis should have been conducted and a limiting instruction given.

**III.**

**OTHER INSTANCES OF PROSECUTORIAL MISCONDUCT WERE UNFAIRLY PREJUDICIAL AND, AS A RESULT, THE CUMULATIVE EFFECT OF THE IMPROPER COMMENTS DENIED APPELLANT A FUNDAMENTALLY FAIR TRIAL**.

¶31. Riddley complains of allegedly improper and inflammatory remarks made by the prosecution during closing argument. Riddley argues that the cumulative effect of these comments plus those raised in Issue I and Issue II denied him a fundamentally fair trial. Therefore, Riddley asks us to reverse his conviction. Riddley submits the following as improper comments by the State during closing argument:

This whole defendant's theory of this case relies on a sell job, and he's trying to sell you a load of B.S., and, actually, he wants just to sell one of you a load to go back so you'll go back there and get hung up on some insignificant detail.

. . . .

No matter how many of these cases I do and no matter how many cases I argue, I've never ceased to be amazed at the endless line of B.S. that comes from this stand up here, and that's under oath.

. . . .

But you got put in this witness stand, and in this box, I should say, because we believe that you had good common sense, and we're asking you to go back there and use your good common sense. And if you don't believe by now that the defense lawyer is trying to sell you a load of B.S. and these witnesses are trying to sell it to you, one of the last things that he argued to you was what's called a manslaughter instruction, . . .

. . . .

And the day has come for you to make a decision. There won't be another one. So you go back there, and you do what's right. And if you believe this defendant didn't murder Mr. Clemmons in cold blood, then come out here and say so because while you're not going to solve the crime problem in this city, you send messages whether you like it or not. You send messages with verdicts to the jail. You send messages out on the street. Not only that, you send messages to us as prosecutors as to what's acceptable conduct in your city. . . .

¶32. Riddley readily admits that no contemporary objections were made by trial counsel to the above comments. Riddley pleads that we should consider these statements combined with the other comments in the first two issues and find that Riddley was denied a fundamentally fair trial. Although we could relax the imposition of the contemporaneous objection rule when required by the interests of justice, we are not inclined to do so in this instance. *Holly v. State*, 671 So. 2d 32, 42 (Miss. 1996). Moreover, we have already held that the prosecution did not act improperly in the first two issues. If we were to reverse Riddley's conviction, it would have to be solely based on the comments described above, which we will not do.

¶33. Again, without waiving the procedural bar we will discuss this issue on the merits. The prosecution's allegedly improper comments break down to two parts, the comments referring to the defense selling a load of "B.S." and a "send a message" argument. We will address the "B.S" comments first. Arguments such as were made in this case where the prosecution argues to the jury that the defense was attempting to feed the jury a line of "B.S." have been held to "border on the inappropriate" but have not been held to independently constitute reversible error, particularly where there is no contemporaneous objection. *Lester v. State*, 692 So. 2d 755, 795 (Miss. 1997) (twice during closing argument, prosecutor told the jury that if they believed the defense's theory, they could write down a verdict of not guilty and she would eat it; our supreme court held these comments bordered on the inappropriate, but Lester failed to make a contemporaneous objection, thus barring this assignment of error). *See also Weatherspoon v. State*, 97-KA-00019-SCT (¶18) (Miss. 1999) (Weatherspoon asserted that the State made inappropriate remarks in closing argument by improperly challenging defendant's counsel, expressing a personal opinion, and vouching for its own truthfulness; no contemporaneous objections were made, as a result, our supreme court held that the issue was procedurally barred from review). Additionally, prosecuting attorneys are entitled to some latitude in closing argument. *Brewer v. State*, No. 95-DP-00915-SCT, 1998 WL 410674, at *26 (Miss. July 23, 1998).

¶34. The prosecutor's reference to the defense selling a load of "B.S." is basically an attack on the credibility of defense witnesses and in essence calling the defendant a liar. Our supreme court has held that it is not improper for a prosecutor to comment that a defendant was lying when that contention is supported in the record. *Hull v. State*, 687 So. 2d 708, 721 (Miss. 1996). The comments complained of are fair comments and fully supported by the evidence. We should note that prosecutors should at all times maintain the proper decorum and professional attitude when engaged at trial. The use of the term "B.S." may not be the most appropriate why to express the fact that the defendant is lying, but it certainly does not rise to reversible error.

¶35. Finally we address the "send a message" argument. Our supreme court has never reversed a conviction based on the use of such arguments, but it has steadfastly warned against using such "send a message" type arguments. *See Evans v. State*, 93-DP-01173-SCT, 94-CA-00176-SCT (¶260-266) (Miss. 1997)*; Wells v. State*, 698 So. 2d 497, 513 (Miss. 1997)*; Wilcher v. State*, 697 So. 2d 1123,

1139 (Miss. 1997)*; Williams v. State*, 522 So. 2d 201, 208-09 (Miss. 1988). We have ourselves stated that in the future we would consider such arguments per se reversible error if properly objected to at trial. *Alexander v. State*, No. 97-01377 COA, 1999 WL 87109 (¶17) (Miss. App. 1999). However, as has been already noted, Riddley failed to object and this issue is procedurally barred.

**IV.**

**THE TRIAL COURT ERRED BY FAILING TO GRANT APPELLANT'S MOTION FOR DIRECTED VERDICT AND MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT AND/OR THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE.**

¶36. Riddley's motions for a directed verdict and for a judgment notwithstanding the verdict both test the legal sufficiency of the evidence. *Johnson v. State*, 642 So. 2d 924, 927 (Miss. 1994) (citing *McClain v. State*, 625 So. 2d 774, 778 (Miss. 1993)). Riddley argues that the evidence presented at trial was insufficient to support a guilty verdict by the jury for the crime of murder, and the evidence failed to prove beyond a reasonable double that Riddley was guilty of anything except perhaps manslaughter.

¶37. When the legal sufficiency of the evidence is challenged, we will not retry the facts but must take the view of the evidence most favorable to the State and must assume that the fact-finder believed the State's witnesses and disbelieved any contradictory evidence. *McClain*, 625 So. 2d at 778; *Griffin v. State*, 607 So. 2d 1197, 1201 (Miss. 1992). On review, we accept as true all evidence favorable to the State, and the State is given "the benefit of all favorable inferences that may reasonably be drawn from the evidence." *Griffin*, 607 So. 2d at 1201 (citations omitted). We will reverse such a ruling only where "reasonable and fairminded jurors could only find the accused not guilty." *McClain*, 625 So. 2d at 778 (citing *Wetz*, 503 So. 2d 803, 808 (Miss. 1987); *Harveston v. State*, 493 So. 2d 365, 370 (Miss. 1986); *Fisher v. State*, 481 So. 2d 203, 212 (Miss. 1985)).

¶38. Riddley was charged with "deliberate design" murder pursuant to Miss. Code Ann. § 97-3-19(1)(a) (Supp. 1998), which reads as follows:

(1) The killing of a human being without the authority of law by any means or in any manner shall be murder in the following cases:

(a) When done with deliberate design to effect the death of the person killed, or of any human being;

¶39. Our supreme court has held that "deliberate design" can be inferred from use of a deadly weapon. *Carter v. State*, 722 So. 2d 1258 (¶21) (Miss. 1998). Our supreme court has also held that although "deliberate design" may not be formed at the instant of the murder, it may be formed "very quickly." *Id.* at (¶18). There was more than sufficient evidence to find Riddley guilty beyond a reasonable doubt of murder. Riddley never denied shooting at Clemmons, but claimed it was in self-defense, as Clemmons fired first. However, Hawkins testified that she saw the victim, later identified as Clemmons, just standing there talking to Riddley when Riddley pulled a gun and shot at Clemmons feet "four or five" times. Hawkins testified that she never saw Clemmons push Riddley or pull a gun on Riddley. Hawkins further testified that Riddley chased Clemmons and shot at him an additional "seven or eight" times. Shaw testified that he never saw Clemmons with a gun nor did he see a gun in the immediate vicinity of Clemmons. Clemmons was shot a total of six times with two wounds in his back and one wound in the back of his leg. There was ample and sufficient evidence to support a guilty verdict.

¶40. The trial court also denied Riddley's motion for a new trial. A motion for a new trial tests the weight of the evidence rather than its sufficiency. *Butler v. State*, 544 So. 2d 816, 819 (Miss. 1989). The Mississippi Supreme Court has stated:

> As to a motion for a new trial, the trial judge should set aside the jury's verdict only when, in the exercise of his sound discretion, he is convinced that the verdict is contrary to the substantial weight of the evidence; this Court will not reverse unless convinced the verdict is against the substantial weight of the evidence.

*Id.* (quoting *Russell v. State*, 506 So. 2d 974, 977 (Miss. 1987)).

¶41. The lower court has the discretionary authority to set aside the jury's verdict and order a new trial only where the court is "convinced that the verdict is so contrary to the weight of the evidence that to allow it to stand would be to sanction an unconscionable injustice." *Roberts v. State*, 582 So. 2d 423, 424 (Miss. 1991) (citations omitted). Based on the record before us, suffice it to say that the evidence was sufficient to allow the case to go to the jury, and the jury's verdict was not against the overwhelming weight of the evidence. These assignments of error are without merit.

## V.

## DURING HIS TRIAL, APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL.

¶42. Riddley, through new counsel on appeal, cites several reasons why his trial counsel was ineffective. The Mississippi Supreme Court adopted the *Strickland v. Washington*, 466 U.S. 668, 687-96 (1984), standard for evaluating ineffective assistance of counsel claims. *Eakes v. State*, 665 So. 2d 852, 872 (Miss. 1995). A defendant has to show that his attorney's performance was deficient, and that the deficiency was so substantial as to deprive the defendant of a fair trial. *Id*. The defendant is required to prove both elements. *Brown v. State*, 626 So. 2d 114, 115 (Miss. 1993); *Wilcher v. State*, 479 So. 2d 710, 713 (Miss. 1985). "Judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. Furthermore, our supreme court has held:

> [T]here is a strong presumption that counsel's performance falls within the range of reasonable professional assistance. To overcome this presumption, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."

*Schmitt v. State*, 560 So. 2d 148, 154 (Miss. 1990) (quoting *Strickland*, 466 U.S. at 694).

¶43. Riddley complains on appeal that he was denied effective assistance of counsel by virtue of five separate transgressions. Riddley complains that his counsel failed to object to improper comments by the prosecution on his right to counsel, failed to object to introduction of prior bad acts and crimes and request cautionary instructions to the jury, failed to object to inflammatory and improper closing argument, failed to properly cross-examine witness Hawkins as to her bias, and failed to move for a directed verdict at the end of the close of evidence. We have already addressed on the merit the claims where trial counsel failed to object. As the prosecution did not act improperly[1] in any of the instances, failure to object is irrelevant as any objections raised would be properly overruled. Furthermore, the record clearly shows that trial counsel

did ask for a directed verdict at the close of the State's case-in-chief and further asked for a JNOV at the close of all evidence.

¶44. We are left with only one alleged deficiency by trial counsel, namely his cross-examination of Hawkins. The record shows that trial counsel thoroughly and effectively cross-examined Hawkins. Any alleged bias from Hawkins was brought out during Riddley's cross-examination by the State. Riddley claimed that Hawkins was biased against him as he once got into a fight with her husband, and he was friends with the person who killed her husband. Riddley admitted that he was brought to jail the night Hawkins's husband was killed. Clearly, trial counsel did not want the jury to hear any of this evidence. In fact it was the State that wanted the jury to hear this evidence and for that reason questioned Riddley about it. Although, it may have shown possible bias by Hawkins the decision not to question her about these incidents was certainly trial strategy.

¶45. There is simply no proof that trial counsel was deficient in his representation of Riddley. Absent any evidence of deficiency or misrepresentation, this entire argument must fail. We hold that Riddley did not show that his counsel was constitutionally ineffective.

¶46. **THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.**

**McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, DIAZ, IRVING, LEE, AND PAYNE, JJ., CONCUR. MOORE, J., NOT PARTICIPATING.**

1. The only arguable improper comment made by the prosecution was the "send a message" argument made during summation. But as already stated, our supreme court has never reversed a conviction solely for this type of argument, even where an objection was raised and overruled. *See Williams*, 522 So. 2d at 208-09; *Carleton v. State*, 425 So. 2d 1036, 1039 (Miss. 1983).