# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2018-KA-00282-SCT

*JONTAVIAN EUBANKS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/31/2017 |
| TRIAL JUDGE: | HON. WILLIAM E. CHAPMAN, III |
| TRIAL COURT ATTORNEYS: | CYNTHIA ANN STEWART |
| | DEWEY KEY ARTHUR |
| | GREGORY VINSON MILES |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | CYNTHIA ANN STEWART |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | JOHN K. BRAMLETT, JR. |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 02/27/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**GRIFFIS, JUSTICE, FOR THE COURT:**

¶1.     Jontavian Eubanks appeals his convictions of burglary of a dwelling and conspiracy

to commit burglary of a dwelling.  Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     Ashley Brown and Jessica Baugh were roommates at the Bay Meadows Apartments

in Ridgeland.  Brown and Baugh also worked together at Last Call Sports Bar in Ridgeland.

¶3.     On January 9, 2016, Brown and Baugh finished their shift and met up with friends,

including Stephanie Mejia, a coworker from the bar.  Brown eventually left and went home.

Baugh and Mejia continued to hang out, and Mejia arranged to spend the night at Brown's and Baugh's apartment. Because Mejia did not have a key to the apartment, Baugh told her that she would leave the door unlocked. Mejia then left Baugh to meet up with her friends. Baugh met her friend Chris Jones and the two went back to Baugh's apartment. According to Baugh, she and Jones arrived at her apartment around 4:00 a.m. on January 10, 2016.

¶4. During the night, Jones woke up Baugh and advised that someone had come into the apartment. Baugh was not concerned because she assumed it was Mejia. Later that morning, Brown woke up Baugh and advised that her car was gone. Brown's keys, along with her debit and credit cards, were also gone. Baugh began to look around the apartment and noticed that her iPad and Michael Kors bag were missing. The tips that Baugh had received from work were in the bag.[1] Brown and Baugh called the police.

¶5. Officer Adrian Ready with the Ridgeland Police Department learned that Amonteel Pates had used Brown's credit card to purchase a pair of shoes on January 10, 2016. Pates was later arrested. When questioned about the incident at Brown's and Baugh's apartment, Pates acknowledged his involvement and culpability and provided the names of the other suspects to Officer Ready. Those suspects were Rahim Williams, Michael Tillman, Fabiyonne Peel, and Eubanks.[2]

¶6. According to Pates, Mejia called and told him that she had something for him to do.

---

[1] According to Baugh, it was her common practice to put her tips in the bag every night at work.

[2] Although Mejia would have likely been a suspect, she was shot and killed sometime after the offenses were reported. This fact was not disclosed to the jury.

Pates explained that he understood this to mean that Mejia wanted him to commit some type of crime. Pates met Mejia at IHOP on the night of January 9, 2016. While Pates met with Mejia, Williams, Tillman, Peel, and Eubanks waited in the parking lot. Mejia advised Pates that Baugh had made good tips at work that night and that she wanted Pates to steal the money, along with Baugh's Michael Kors bag. Pates was aware that Mejia had arranged to spend the night at Baugh's and Brown's apartment and that Baugh would leave the door unlocked.

¶7. In the early morning hours of January 10, 2016, Pates drove to Baugh's and Brown's apartment in Mejia's car. When he arrived, Williams, Tillman, Peel, and Eubanks were already at the apartment. According to Pates, Williams, Tillman, Peel, and Eubanks went inside the apartment. Tillman came out of the apartment first and was carrying some keys and throwing out credit cards. Pates picked up all of the credit cards. Tillman located Brown's vehicle, an orange Dodge Charger, and drove off.

¶8. When Williams, Peel, and Eubanks came out of the apartment, they advised Pates that they were unable to locate the Michael Kors bag. Williams, Peel, and Eubanks then went back into the apartment a second time. When they emerged, Williams was carrying the Michael Kors bag, and Eubanks was carrying an iPad. Pates acknowledged that he, Williams, Tillman, Peel, and Eubanks all communicated via cell phone that night.

¶9. Officer Ready obtained arrest warrants for Williams, Tillman, Peel, and Eubanks and attempted to locate Eubanks at his home in Jackson. When he arrived at Eubanks's home, Officer Ready noticed that a vehicle registered to Peel was in the driveway. Officer Ready

entered the home and located Eubanks in the rear bedroom; Eubanks was pretending to sleep on the bed. Peel was hiding beside the bed under a pile of clothes.

¶10. During his search of Eubanks's residence, Officer Ready located Baugh's iPad that had been stolen from her apartment. He also seized three cell phones. Officer Ready was able to identify the cell-phone numbers of each of the suspects and subpoenaed their cell phone records. The cell-phone records revealed that Eubanks, Pates, and Williams had been in communication with Mejia throughout the night of the alleged offenses. According to Brown and Baugh, Mejia was the only person who had permission to enter their apartment on the night of the alleged offenses.

¶11. Eubanks, Pates, Peel, Williams, and Tillman were indicted on Count I, burglary of a dwelling, Count II, conspiracy to commit burglary of a dwelling, Count III, motor-vehicle theft, and Count IV, conspiracy to commit motor-vehicle theft. Pates pleaded guilty and was sentenced to twenty-five years in the custody of the Mississippi Department of Corrections (MDOC), with ten years to serve. As part of his plea agreement, Pates testified against Eubanks at trial.

¶12. Eubanks was convicted of Count I, burglary of a dwelling, and Count II, conspiracy to commit burglary of a dwelling, and was sentenced to serve twenty-five years in the custody of the MDOC on Count I and five years on Count II, with the sentences to run concurrently to each other, but consecutively to any and all other sentences. He was further ordered to pay $698.50 in court costs, fees, and assessments. Eubanks was acquitted on Counts III and IV.

¶13.    Eubanks filed a motion for a judgment notwithstanding the verdict or, alternatively, a new trial.  The motion was denied.  Eubanks timely appealed.  On appeal, Eubanks asserts that the trial court erred by (1) denying his motion for funds to retain an expert for trial, (2) denying his motion for funds to retain an expert for a ***Daubert***[3] hearing, (3) overruling his ***Batson***[4] challenge, and (4) permitting hearsay testimony to establish essential elements of the charged offenses.

## ANALYSIS

    *I.      Whether the trial court erred by denying Eubanks's motion for funds to retain an expert.*

¶14.    Before trial, the State advised that it intended to call representatives from T-Mobile, AT&T, and C Spire, as well as an investigator from the Attorney General's Office, to testify regarding the cell-phone records of Eubanks, Pates, Williams, and Tillman.  In response, Eubanks filed a motion in limine to exclude the expert witnesses' testimonies.  In the motion, Eubanks asserted that "[t]he purpose of the [cell-phone] records and testimony [wa]s to show which cellular towers the various cell phones 'pinged' off of during calls or texts made during or about the time of the alleged criminal activity."  Eubanks argued that "[t]he science behind the 'pinging' of a particular phone on a particular cell tower . . . is flawed."  As a result, Eubanks moved in limine to exclude any expert testimony concerning his location "at

---

[3] ***Daubert v. Merrell Dow Pharm., Inc.***, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

[4] ***Batson v. Kentucky***, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

[a] given time by use of cell phone data."[5]

¶15.   Eubanks also filed a motion for funds to retain an expert and to proceed *in forma pauperis*.  The trial court deferred ruling on the motion because defense counsel had not offered any information regarding the name of the expert or the associated costs.  Eubanks then filed a "Supplemental Motion for Expert and Funds and To Proceed In Forma Pauperis" and included that information.  In the motion, Eubanks asserted that he needed an expert who was knowledgeable "as to technical cell phone tower issues . . . to review the [cell-phone] records and evidence [in order] to assist with cross-examination and [to] rebut [the State's expert] testimony."  Eubanks further asserted that he needed the assistance of an expert to prepare for the ***Daubert*** hearing on his motion in limine.  According to Eubanks, he "d[id] not have the funds to pay for such an expert" and therefore "s[ought] the [c]ourt's intervention for payment of these funds."[6]

¶16.   At the motion hearing, the trial court found that because the State was not relying on expert testimony alone to prove an element of the offense, Eubanks was not entitled to an expert to assist in his defense.  As a result, the trial court denied Eubanks's motion for expert and funds.  The trial court did not consider Eubanks's motion to proceed *in forma pauperis*.  Eubanks's motion in limine was denied.

¶17.   On appeal, Eubanks argues that the trial court erred "in refusing to grant funds for an

---

[5] At the hearing, defense counsel explained that the "motion in limine . . . [was] to exclude the witness based on the technology being insufficient."

[6] Eubanks's trial counsel was retained.  Eubanks asserts that although he initially had sufficient funds to hire trial counsel, he did not have the funds to hire an expert.

expert." Eubanks asserts he needed an expert to (1) assist in the preparation for trial and (2) assist in the preparation for a *Daubert* hearing. Although Eubanks separately raises these issues in his brief on appeal, this Court addressed both issues jointly.

¶18. A trial court's decision to deny a request for funds to hire an expert is reviewed for an abuse of discretion. *Ruffin v. State*, 447 So. 2d 113, 118 (Miss. 1984).

> That there can conceivably be instances when the state in fairness should be required to pay the cost of an expert needed by the defense to insure a fair trial for an indigent accused must be conceded. Those cases can only be left to the discretion of the trial court, and they will be rare.

*Id.* at 118.

¶19. The United States Supreme Court has held that the "basic tools of an adequate defense or appeal" must "be provided to those defendants who cannot afford to pay for them." *Ake v. Oklahoma*, 470 U.S. 68, 77, 105 S. Ct. 1087, 77 L. Ed. 2d 53 (1985) (internal quotation marks omitted) (quoting *Britt v. North Carolina*, 404 U.S. 226, 227, 92 S. Ct. 431, 30 L. Ed. 2d 400 (1971)). In order to determine whether an expert is a "basic tool[] of an adequate defense," three factors are considered: (1) "the private interest that will be affected by the action of the State"; (2) "the governmental interest that will be affected if the safeguard is to be provided"; and (3) "the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided." *Id.* at 77. Under the first prong, the private interest at issue is "an individual's interest in accurate criminal proceedings, which is 'uniquely compelling' and heavily weighs in the individual's favor." *Isham v. State*, 161 So. 3d 1076, 1082 (Miss. 2015) (quoting *Lowe v. State*, 127 So. 3d 178, 182 (Miss. 2013)). Under the

7

second prong, the governmental interest is a pecuniary interest "given that the county government must provide funds for a court-ordered expert." *Id.* But such an interest is "insubstantial" and is "outweighed" by both the individual's and the government's interest in a fair and accurate criminal proceeding. *Id.* "Finally, the third prong, which this Court analyzes the most intensely, requires the trial court to balance the probative value of expert testimony for [Eubanks] against the risk of not providing him expert assistance." *Id.* Although a State is not required to "purchase for the indigent defendant all the assistance that his wealthier counterpart might buy . . . , fundamental fairness entitles indigent defendants to 'an adequate opportunity to present their claims fairly within the adversary system.'" *Ake*, 470 U.S. at 77 (quoting *Ross v. Moffitt*, 417 U.S. 600, 612, 94 S. Ct. 2437, 41 L. Ed. 2d 341 (1974)).

¶20. "An indigent's right to defense expenses is 'conditioned upon a showing that such expenses are needed to prepare and present an adequate defense.'" *Green v. State*, 631 So. 2d 167, 171 (Miss. 1994) (emphasis omitted) (quoting *Ruffin*, 447 So. 2d at 118). A party seeking assistance "is required to offer concrete reasons for requiring such assistance, not 'undeveloped assertions that the requested assistance would be beneficial . . . .'" *Hansen v. State*, 592 So. 2d 114, 125 (Miss. 1991) (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1, 105 S. Ct. 2633, 86 L. Ed. 2d 231, (1985)).

> This Court weighs on a case by case basis whether the denial of expert assistance for an accused is prejudicial to the assurance of a fair trial and will grant relief only where the accused demonstrates that the trial court's abuse of discretion is so egregious as to deny him due process and where his trial was thereby rendered fundamentally unfair.

*Johnson v. State*, 529 So. 2d 577, 590 (Miss. 1988) (citing *Johnson v. State*, 476 So. 2d 1195, 1203 (Miss. 1985)).

¶21.   In *Lowe*, this Court found that the defendant's need for an expert was vital.  *Lowe*, 127 So. 3d at 184.  The Court noted that the State could not prove an element of the charged offense without expert testimony.  *Id.* at 183.  The Court held,

> Where . . . the State relies on expert testimony *alone* to connect the defendant to the offense charged, an independent defense expert is part of the "raw materials integral to building an effective defense," and the trial judge deprives an indigent defendant of a fundamentally fair trial by refusing him funds to procure such an expert.

*Id.* at 184 (emphasis added) (quoting *Ake*, 470 U.S. at 77).

¶22.   Additionally, in *Brown v. State*, 152 So. 3d 1146, 1169 (Miss. 2014) (quoting *Lowe*, 127 So. 3d at 184), this Court found that an "expert is necessary here in order to make the trial 'fundamentally fair.'"  In *Brown*, the defendant was convicted of the capital murder of his son, who died of injuries the pathologist opined were consistent with shaken-baby syndrome.  *Id.* at 1156-57.  Before trial, the defendant requested funds to hire a medical expert to challenge the pathologist's testimony regarding the cause of death.  *Id.* at 1165.  The trial court denied the motion because the defendant had been able to post bond and to retain counsel.  *Id.*  On appeal, this Court reversed and found that the pathologist "offered the *only* evidence on both the underlying felony of child abuse and the cause and manner of death . . . ."  *Id.* at 1167 (emphasis added).  In other words, "the sole primary basis for [his capital murder charge] [was] the finding and anticipated testimony of the Pathologist . . . ."  *Id.* at 1166 (first alteration in original).  The Court determined that without an expert, the

9

defendant "was denied the 'raw materials integral to the building of an effective defense'. . . ." *Id.* (quoting *Ake*, 470 U.S. at 77).

¶23.    In denying Eubanks's motion for funds to hire an expert, the trial court relied on *Isham*.[7]   In *Isham*, the defendant was charged with felony child abuse.  *Id.* at 1079. "Accordingly, it was essential to the State's case that it prove that the child's injuries were inflicted through blunt force or abusive nonaccidental trauma and that they could have been sustained by the child only though such nonaccidental trauma." *Id.* at 1083.  Eleven days before the trial was scheduled to begin, the defendant filed a motion for expert funding. *Id.* at 1079.  The trial court denied the motion because "the defendant had not provided a concrete reason for requiring defense experts in the case . . . ." *Id.* at 1079.

¶24.    On appeal, this Court noted that "it [wa]s unquestionable that the State's experts were the *only* source of the testimony concerning [the] essential components of the prosecution's proof." *Id.* (emphasis added).  Relying on *Lowe* and *Brown*, this Court found that because "the State's primary evidence showing that [the defendant] had committed the crime came through expert testimony," the trial court erred by denying the defendant's motion for funds to retain an expert. *Id.* at 1084.

¶25.    Here, Eubanks was convicted of burglary of a dwelling and conspiracy to commit

_____

        [7] Justice Coleman asserts that the trial court did not discuss the *Ake* factors.  While the record reflects that the trial court did not specifically cite *Ake*, it did review various cases, including *Isham*, which discusses *Ake* and each *Ake* factor.  *See Isham*, 161 So. 3d at 1081-82.  Thus, although the trial court did not specifically reference *Ake*, it did consider *Isham* and, in turn, the *Ake* factors.

burglary of a dwelling. "Burglary consists of breaking and entering the dwelling house of another with intent to commit some crime therein." ***Pool v. State***, 764 So. 2d 440, 444 (Miss. 2000). "Conspiracy is a combination of two or more persons who conspire to commit a crime." ***Johnson v. State***, 832 So. 2d 1263, 1265 (Miss. Ct. App. 2002) (citing Miss. Code Ann. § 97-1-1 (Rev. 2000)). The record shows that in order to prove the elements of the charged offenses, the State relied primarily on the testimony of Pates, Eubanks's codefendant, and Officer Ready. Pates identified Eubanks as a perpetrator of the alleged offenses. Pates testified that he communicated with Eubanks on the night of the alleged offenses and saw Eubanks enter the apartment and later exit the apartment carrying an iPad. Officer Ready testified that after Eubanks was located, the stolen iPad was found in his possession. He further testified that cell-phone records indicated that Eubanks, Pates, and Williams had been in communication with Mejia throughout the night of the alleged offenses. The expert testimony regarding the cell-phone records was unnecessary to prove the charged offenses. Instead, it simply corroborated Pates's testimony regarding Eubanks's presence at the apartment on the night in question and his involvement and participation in the charged offenses. Thus, unlike in ***Lowe***, ***Brown***, and ***Isham***, the State did not rely on expert testimony alone to connect Eubanks to the charged offenses.

¶26. Additionally, the record shows that Eubanks failed to show a substantial need or a concrete reason for expert assistance. Eubanks argues that he needed an expert to analyze the cell phones and cell-phone data because "[t]he science behind the 'pinging' of a particular phone on a particular cell tower . . . is flawed." But "pinging" was not used in this

11

case. Instead, the State's experts reviewed historical call-detail records to determine the approximate location of the cell phones when the calls were made. Charlie Rubisoff, an expert in historical cell mapping, testified that each of the parties' cell-phone records indicated that their phones had been used within the general area of the apartment where the offenses occurred at the approximate time that the offenses occurred.

¶27. Eubanks acknowledges that "[t]he connections of [a] cell phone to a particular tower can be helpful in putting someone in a wide specific area." He claims, however, that "the inaccuracy of determining location from 'pinging' is widely recognized as a problem by law enforcement." He contends that "without an independent expert, [defense] counsel had no way of ensuring that the data would show which cellular towers the various phones 'pinged' off of during calls or texts made during or about the time of the alleged criminal activity." But, as previously stated, pinging, a form of contemporaneous surveillance, was not used and is not relevant here. Thus, based on Eubanks's argument, it is unclear how an expert would have assisted in Eubanks's defense.

¶28. Eubanks asserts that had he been allowed to retain an independent expert, the expert "would have *possibly* been able to refute the State's experts opinions." (Emphasis added.) But such an assertion, i.e., that expert assistance would possibly be beneficial, is insufficient to warrant the requested relief. *See **Hansen***, 592 So. 2d at 125 (quoting ***Caldwell***, 472 U.S. at 323 n.1). Regardless, the record shows that defense counsel, without the requested expert assistance, thoroughly cross-examined the experts on their historical call-data analysis and its reliability regarding device location. Specifically, on cross-examination, Rubisoff

12

acknowledged that the historical call-data analysis or methodology does not track people, it tracks only devices. Moreover, he acknowledged that the methodology would not provide a precise location for a device, just a general geographic area.

¶29.   Eubanks fails to show how the trial court's refusal of funds for an expert deprived him of a fundamentally fair trial or *Daubert* hearing. Stated differently, Eubanks fails to show that he required the assistance of an expert as a "basic tool[] of an adequate defense." *Ake*, 470 U.S. at 77. As a result, the trial court did not abuse its discretion by denying Eubanks's motion for funds to retain an expert.

> II.     *Whether the trial court erred by overruling Eubanks's* **Batson** *challenge.*

¶30.   Eubanks next argues that the trial court erred by overruling his *Batson* challenge. In *Batson*, the United States Supreme Court held that parties could not exercise peremptory strikes based solely on a potential juror's race. *Batson*, 476 U.S. at 89. "*Batson* requires a three-pronged inquiry." *Lynch v. State*, 877 So. 2d 1254, 1270 (Miss. 2004).

> First, the party objecting to the peremptory strike of a potential juror must make a prima facie showing that race was the criterion for the strike. Second, upon such a showing, the burden shifts to the State to articulate a race-neutral reason for excluding that particular juror. Finally, after a race-neutral explanation has been offered by the prosecution, the trial court must determine whether the objecting party has met its burden to prove that there has been purposeful discrimination in the exercise of the peremptory strike, i.e., that the reason given was a pretext for discrimination.

*H.A.S. Elec. Contractors, Inc. v. Hemphill Constr. Co.*, 232 So. 3d 117, 133 (Miss. 2016) (citing *Pitchford v. State*, 45 So. 3d 216, 224 (Miss. 2010)).

¶31.   "After the State offers its reasons for striking a potential juror, the defendant is

13

allowed to rebut the reasons offered by the State." *Lynch*, 877 So. 2d at 1271 (citing *Walker v. State*, 815 So. 2d 1209, 1215 (Miss. 2002)). "[I]t is incumbent upon a defendant claiming that proffered reasons are pretextual to raise the argument before the trial court. The failure to do so constitutes waiver." *Id.* (internal quotation marks omitted) (quoting *Manning v. State*, 735 So. 2d 323, 339 (Miss. 1999)). "[O]nce the [striking] party offers a valid race-neutral reason, the trial judge must allow the strike unless the other party demonstrates that the valid race-neutral reason was a pretext for discrimination.'" *H.A.S.*, 232 So. 3d at 124 (quoting *Hardison v. State*, 94 So. 3d 1092, 1100 (Miss. 2012)). In other words, "[u]nless a discriminatory intent is inherent in the . . . explanation, the reason offered will be deemed race neutral." *Id.* at 133 (internal quotation marks omitted) (quoting *Randall v. State*, 716 So. 2d 584, 588 (Miss. 1998)).

¶32.    In considering a *Batson* challenge,

> [w]e give great deference to the trial court's findings of whether or not a peremptory challenge was race-neutral. . . . Such deference is necessary because finding that a striking party engaged in discrimination is largely a factual finding and thus should be accorded appropriate deference on appeal. . . . Indeed, we will not overrule a trial court on a *Batson* ruling unless the record indicates that the ruling was clearly erroneous or against the overwhelming weight of the evidence. . . .

*Lynch*, 877 So. 2d at 1270 (quoting *Walker v. State*, 815 So. 2d 1209, 1214 (Miss. 2002)).

¶33.    During jury selection, defense counsel raised a *Batson* challenge after the State utilized its peremptory strikes against potential jurors 1, 2, 5, 6, 14, and 19, all of whom are African-American. The trial court found that because the State had used all of its peremptory strikes against African-Americans, a prima facie case of discrimination had been shown. As

14

a result, the trial court required the State to provide a race-neutral reason for each peremptory strike.

*Potential Juror 1*

¶34. The State explained that it exercised a peremptory strike against potential juror 1 because she was unemployed and had a brother who previously had been convicted of armed robbery and had served time. Defense counsel offered no rebuttal. The trial court accepted the State's race-neutral reasons and allowed the peremptory strike.

*Potential Juror 2*

¶35. The State exercised a peremptory strike against potential juror 2 because he had been arrested for possession of a controlled substance and for driving under the influence in Madison County, had only been employed for five months, and had a high-school education. Defense counsel did not rebut the State's reasons for striking potential juror 2. The trial court accepted the State's race-neutral reasons and allowed the peremptory strike.

*Potential Juror 5*

¶36. According to the State, potential juror 5 had an incomplete questionnaire and a high-school education. Defense counsel disputed the incomplete questionnaire and asserted that potential juror 18, an African-American, was accepted with only a high-school education. The State explained that it chose potential juror 18 because she had been employed as a secretary for fifteen years at University of Mississippi Medical Center. Although potential juror 5 was employed as a research assistant at the Mississippi Department of Health, she failed to indicate how long she had been employed. The trial court found that the State's

15

reasons were sufficient and allowed the peremptory strike.

¶37. The dissent asserts that "the question of how long [potential juror 5] had worked for her current employer was a question that the State easily could have asked on voir dire if it had concerns." Diss. Op. ¶ 71. But whether the State could have addressed this during voir dire disregards the issue. The issue is not how long potential juror 5 had been employed; instead, the issue is that she failed to complete her juror questionnaire. Regardless of whether such failure was voluntary or involuntary, it is a legitimate concern for the State. Whether she purposefully disregarded the question or accidently omitted it, her failure to complete the questionnaire indicates either a disregard of direction or a lack of attentiveness. As a result, the State chose to exercise one of its peremptory strikes because of the incomplete questionnaire.

### Potential Juror 6

¶38. The State exercised a peremptory strike against potential juror 6 because he had only a high-school education. The State explained again its reasons for choosing potential juror 18 over the other potential jurors with only a high-school education. The State explained it liked potential juror 18's demeanor and body language and described her as "open." Defense counsel noted that potential juror 6 was employed as an auto technician at Nissan, which requires "a certain degree of skill." The State responded that potential juror 8, who was dismissed for cause because he knew Eubanks's mother, also worked at Nissan, and the State did not want to take the risk that they might know each other or work together. The trial court found that the State's reasons were not a pretext for discrimination and allowed the

16

peremptory strike.

¶39. The dissent finds the State's reasoning for striking potential juror 6 "clearly pretextual" since potential juror 8 stated that he did not know anyone else on the jury panel. Diss. Op. ¶ 74. The dissent goes to great lengths to research the number of employees at the Nissan plant and concludes that "the chances that two employees know one another are slim." Diss. Op. ¶ 74 n.15. While we do not dispute the numbers, we note that of the more than six thousand employees at Nissan, only two were on the jury panel.

¶40. Potential juror 8 was dismissed for cause because he knew Eubanks's mother. While potential juror 8 stated that he did not personally know anyone else on the panel, the State chose to exercise a peremptory strike on potential juror 6 in order to eliminate any risk that the two worked in the same area or department. In other words, the State struck the only other Nissan employee on the panel and, instead, accepted another juror with no affiliation with or connection to Nissan.

*Potential Juror 14*

¶41. The State exercised a peremptory strike against potential juror 14 because she knew defense counsel. In response, defense counsel clarified that she was not raising a ***Batson*** challenge as to potential juror 14.

*Potential Juror 19*

¶42. The State exercised its last peremptory strike against potential juror 19 because she lived in the same apartment complex as codefendant Pates's mother, Anita Pates. According to the State, Anita Pates, "[ran] her mouth quite a bit to a lot of different people and

17

complained a good bit." Anita Pates was not happy with the State and the prosecution of her son and "[had] talked to anybody [who] would listen about this case . . . ." The State explained it "[didn't] want to take an angry codefendant's mother's potential neighbor." The trial court found that the State's reasons were not pretextual and allowed the peremptory strike.

¶43. The dissent finds "no record support" for the State's strike of potential juror 19. Diss. Op. ¶ 75. The dissent notes that the apartment complex "has nearly six hundred units" and states that even if Anita Pates spoke to some neighbors, "it seems unlikely that she reached all six hundred of them." Diss. Op. ¶ 75 n.16. As with potential juror 6, the State chose to exercise one of its peremptory strikes to eliminate the risk all together. Again, of the more than six hundred apartment residents, only one was on the venire. The State chose to strike her and accept another juror who did not live near or around the codefendant's mother.

¶44. The dissent finds that the prosecutor "was engaged in an either/or analysis: he knew he had to accept two black jurors, so he picked the ones he liked 'best.'" Diss. Op. ¶ 72. But the purpose of voir dire is to choose the most appropriate jurors to hear the case. The prosecutor did not "pick[]" the jurors "*he* liked 'best.'" Diss. Op. ¶ 72. Instead, the State accepted those jurors it determined were best suited to hear the case based on the facts of the case and the information learned during voir dire.

¶45. Importantly, in *Lockett v. State*, 517 So. 2d 1346, 1353 (Miss. 1987), this Court offered "racially neutral reasons upheld by other courts in an effort to provide some guidance to [the] trial courts." Those reasons include: criminal record, employment history, short-term

18

employment, educational background, arrest of family member, involvement of relative of juror in a crime, demeanor, and incomplete questionnaire or card. *Id.* at 1356.

¶46.    The record shows that the State provided valid race-neutral reasons for each of its peremptory strikes. Eubanks fails to demonstrate that the reasons given were a pretext for discrimination or that a discriminatory intent was inherent in the State's explanation. *H.A.S.*, 232 So. 3d at 133. As a result, the trial court's ruling was not clearly erroneous or against the overwhelming weight of the evidence. *Lynch*, 877 So. 2d at 1270. Accordingly, the trial court did not err.

> III.    *Whether the trial court erred by permitting hearsay testimony to establish the essential elements of the charged offenses.*

¶47.    Eubanks last argues that "the trial court erred in permitting hearsay proof to establish essential elements of the offenses charged." "As an evidentiary matter, [this Court] review[s] the trial [court]'s ruling for an abuse of discretion and will reverse if the admission of evidence results in prejudice to the accused." *Rogers v. State*, 95 So. 3d 623, 627 (Miss. 2012) (citing *Price v. State*, 898 So. 2d 641, 653 (Miss. 2005)).

¶48.    Eubanks fails to cite any authority in support of this argument. "The [appellant's f]ailure to cite relevant authority obviates the appellate court's obligation to review such issues." *Batiste v. State*, 121 So. 3d 808, 861 (Miss. 2013) (alteration in original) (internal quotation marks omitted) (quoting *Simmons v. State*, 805 So. 2d 452, 487 (Miss. 2001)). "Failure to cite legal authority in support of an issue is a procedural bar on appeal." *Carter v. Miss. Dept. of Corrs.*, 860 So. 2d 1187, 1193 (Miss. 2003) (quoting *Webb v. DeSoto Cty.*, 843 So. 2d 682, 685 (Miss. 2003)). Notwithstanding the procedural bar, Eubanks's claim is

without merit.

¶49.    "Hearsay" is defined as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Miss. R. Evid. 801(c).

¶50.    At trial, the following conversation occurred:

| | |
|---|---|
| Prosecutor: | Okay.  Did [Pates] ultimately tell you who was involved with the crime? |
| Officer Ready: | He did. |
| Prosecutor: | What did - who did he tell? |
| Officer Ready: | He said that he, along with Rahim – |
| Defense Counsel : | Your Honor, I would object to hearsay. |
| Trial Court: | It gets awful close to some substantive proof.  Is there another way you can approach it? |
| Prosecutor: | I can rephrase the question |
| Trial Court: | Do that. |
| Prosecutor: | Did . . . Pates ultimately admit some culpability in this? |
| Officer Ready: | Yes. |
| Prosecutor: | Based on your conversation with . . . Pates, not what he said, but based on your conversation with him, did you develop other suspects? |
| Officer Ready: | I did. |
| Prosecutor: | And who are those potential other suspects? |
| Officer Ready: | Rahim Williams, Michael Tillman, Fabiyonne Peel, and Jontavian Eubanks. |

20

¶51. Eubanks asserts that the trial court erroneously "allowed the State to elicit testimony from Officer Ready that . . . Pates told him who was involved with the crime." This Court disagrees. Whether the suspects were involved with or actually participated in the alleged crime was not offered through Officer Ready's testimony. Instead, that information came from codefendant Pates. Officer Ready's statements simply explained the progression of his investigation. "Statements do not constitute hearsay when admitted to explain an officer's course of investigation or motivation for the next investigatory step by that officer." *Smith v. State*, 258 So. 3d 292, 309 (Miss. Ct. App. 2018) (internal quotation marks omitted) (citing *Fullilove v. State*, 101 So. 3d 669, 675 (Miss. Ct. App. 2012)).

¶52. Eubanks further asserts that the trial court erroneously allowed Brown to testify as to the value of the stolen vehicle.[8] At trial, Brown was asked if her family received compensation from the insurance company for the vehicle. In response, Brown stated that her mother had received "about $13,000" in compensation for the vehicle. Eubanks's contention that "the only source of the information testified to came from what [Brown's] parents (the owners and insured on the vehicle) told her" is unsupported by the record. Moreover, such testimony was admitted to prove the elements of Count III, motor-vehicle theft. Eubanks was acquitted on Count III. As such, no prejudice resulted from the admission of such testimony.

## CONCLUSION

¶53. We find no error and affirm.

---

[8] The vehicle was driven by Brown, but it belonged to her mother, Beverly Brown.

¶54.   **AFFIRMED.**

**RANDOLPH, C.J., MAXWELL, BEAM AND CHAMBERLIN, JJ., CONCUR. COLEMAN, J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION JOINED BY CHAMBERLIN, J.; MAXWELL, J., JOINS IN PART. KING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J., AND ISHEE, J.**

**COLEMAN, JUSTICE, CONCURRING IN PART AND IN RESULT:**

¶55.   Mississippi considers three factors, adopted from *Ake v. Oklahoma*, 470 U.S. 68 (1985), when determining whether a trial court should order funding of an expert witness for a criminal defendant. *Lowe v. State*, 127 So. 3d 178, 182-83 (¶¶ 16-20) (Miss. 2013); *Coleman v. State*, 697 So. 2d 777, 782 (Miss. 1997).

> The first is the private interest that will be affected by the action of the State. The second is the governmental interest that will be affected if the safeguard is to be provided. The third is the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided.

*Lowe*, 127 So. 3d at 182 (¶ 17) (quoting *Ake*, 470 U.S. at 77). At the pretrial hearing in the case *sub judice*, the State first cited *Ake* but then argued that our cases, including those discussed below and by the majority, have held that only when the State relies on expert testimony alone to prove an element of the crime may the defendant have funding for an expert. Because the trial court used the wrong legal standard, I would hold that it erred.

¶56.   The trial court did not, and the majority does not discuss the above-quoted *Ake* factors. In ruling on Eubanks's motion for funding, the trial court described the controlling law as "abundantly clear" and described the legal standard as requiring funding for a defense expert only when the State relies on expert testimony alone to prove an element of the

charged crime. Issues of law are reviewed *de novo*, ***Hall v. State***, 127 So. 3d 202, 204 (¶ 6) (Miss. 2013) (citing ***Downs v. State***, 962 So. 2d 1255, 1258 (¶ 10) (Miss. 2007)), and whether the trial court applied an incorrect legal standard to Eubanks's request is an issue of law. ***Mallard v. Burkart***, 95 So. 3d 1264, 1268-1269 (¶ 10) (Miss. 2012). The trial court erred as a matter of law by applying a standard far more restrictive than the three-factor ***Ake*** test.

¶57. The majority adopts the State's position that because the State did not rely wholly on expert testimony to prove any one element of the crime, the trial court's denial of expert witness funding should be affirmed. Maj. Op. ¶ 25. The Court in ***Lowe***, ***Brown v. State***, 152 So. 3d 1146 (Miss. 2014), and ***Isham v. State***, 161 So. 3d 1076 (Miss. 2015), indeed held that expert funding is required when the State relies on expert testimony alone to prove an element of an offense; it did not, however, like the trial court in the instant case, hold that the reliance of the State on expert testimony alone is *the* requirement for funding. The narrowness of such a holding contradicts and constrains the three-factor ***Ake*** test the ***Lowe*** Court employed to reach its holding. Likewise, it is inconsistent with the ***Brown*** Court's assertion that "The relative importance of the testimony offered by the State's experts is *one factor* to consider in assessing the fairness of the trial." ***Brown***, 152 So. 3d at 1166 (¶ 90) (emphasis added) (citing ***Harrison v. State***, 635 So. 2d 894, 901 (Miss. 1994)). The majority places too many of its eggs in one basket and comes too close to holding, consistent with the trial court's erroneous explication of the standard, that expert funding need only be provided when the State relies on an expert witness alone to prove an element of the charged crime.

23

¶58.    In the end, though, the trial court's error in failing to apply the three *Ake* factors to

Eubanks's request was harmless.

> Harmless-error analysis prevents "setting aside convictions for small errors or
> defects that have little, if any, likelihood of having changed the result of the
> trial." We do not reverse a conviction for an erroneous evidentiary ruling
> unless "the error adversely affects a substantial right of a party," or in other
> words, unless the ruling prejudiced the accused. Thus, where it is "clear
> beyond a reasonable doubt that the error did not contribute to the verdict," we
> need not reverse the conviction.

*Smith v. State*, 136 So. 3d 424, 435 (¶ 27) (Miss. 2014) (citations omitted). At trial,

Eubanks rested without calling a witness. The State offered testimony of a co-conspirator

who testified about Eubanks's involvement in the crime and an eyewitness who saw Eubanks

exit a stolen car. An iPad Mini, stolen during the crime in question, was recovered from

Eubanks's home. Finally, it is far from clear that Eubanks would have been entitled to the

funding had the three *Ake* factors been correctly utilized.

¶59.    I concur with the majority's treatment of the remaining issues raised by Eubanks.

Accordingly, I concur in part and in result.

    **CHAMBERLIN, J., JOINS THIS OPINION. MAXWELL, J., JOINS THIS
OPINION IN PART.**

    **KING, PRESIDING JUSTICE, DISSENTING:**

¶60.    This Court should find that the trial court clearly erred in its ***Batson***[9] determination

that no violation occurred, in this case in which the State used every available strike on

African-American jurors. Therefore, I respectfully dissent.

¶61.    "Other than voting, serving on a jury is the most substantial opportunity that most

---

[9]***Batson v. Kentucky***, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

citizens have to participate in the democratic process." ***Flowers v. Mississippi***, 139 S. Ct. 2228, 2238, 204 L. Ed. 2d. 638 (2019). Not only does ***Batson*** seek to protect the rights of defendants, it also seeks to "protect the rights of . . . jurors, and to enhance public confidence in the fairness of the criminal justice system." ***Id.*** at 2242. Thus, the "eradicat[ion] of racial discrimination in the jury selection process" is a constitutional principle that this Court is charged with enforcing. ***Id.*** However, since ***Batson***, we have done a poor job of enforcing both the rights of the potential jurors to be free from discrimination, and the rights of criminal defendants to be tried by a jury free from the taint of racial discrimination.

### 1.    Batson *in the Mississippi Supreme Court*

¶62.    At the outset, I note my concerns that this Court uses the deferential standard of review used in ***Batson*** cases as a shield to avoid holding prosecutors and trial courts accountable. A deferential standard of review is not (and should not be) a rubber stamp on trial court decisions; yet, that is how this Court has wielded it in ***Batson*** cases. And prosecutors seem adept at making increasingly better excuses for striking African-American jurors, actions for which this Court has shown no interest in holding the State accountable.

¶63.    The United States Supreme Court's decision in ***Batson*** was "founded upon the realities that substantial and invidious racial discrimination was being practiced in jury selection, [and] that this was a state-sponsored sin[.]" ***Davis v. State***, 551 So. 2d 165, 176 (Miss. 1989) (Robertson, J., concurring). Since ***Batson*** was decided, this Court has reviewed approximately 117 cases for race-based, substantive ***Batson*** issues.[10] *See* Appendix A. Of

---

[10]I do not count in this number ***Batson*** issues raised on post-conviction relief, ***Batson*** issues solely deemed waived or procedurally barred, or ***Batson*** issues in which the case is

25

those cases, 105 involved strikes of African-American jurors and fifteen involved strikes of white jurors.[11]  Of the cases involving strikes of African-Americans in which the trial court found no *Batson* violation, this Court affirmed the trial court's findings in one hundred of those cases and reversed the trial court in five of those cases.  Of the thirteen cases in which the trial court found a *Batson* violation for the strike of white jurors, this Court affirmed the trial court eleven times and reversed it twice.  This Court affirmed the two cases in which the trial court found no *Batson* violation for the striking of white jurors.  These numbers paint a troubling picture of this Court's willingness to allow prosecutors to exclude black jurors from jury service.[12]  And the five reversals are certainly nothing to herald.

¶64.    In two of the reversals, this Court reversed because the State admitted that it struck black jurors based on race.  *Goggins v. State*, 529 So. 2d 649 (Miss. 1988); *Dedeaux v. State*, 528 So. 2d 300 (1988).  In two of the reversals, the trial court's factual findings appeared to explicitly find pretext, yet the trial court inexplicably allowed the strikes.  *Berry v. State*, 728 So. 2d 568 (Miss. 1999) (The trial court rejected the State's challenge of one juror as

---

reversed and/or remanded due to a failure to follow the proper *Batson* procedure.  This number likewise does not include cases decided on solely gender or religious claims.  It encompasses the cases in which this Court reviewed the trial court's determinations regarding whether a prima facie case was made and/or whether pretext existed.

[11]The total numbers do not match because three cases involved strikes of both African-American and white jurors.

[12] I recognize that these numbers do not paint a perfect picture.  For example, when trial courts rule against the State on these matters in criminal cases, those rulings would rarely be appealed.  Further, in several of these cases, I acknowledge that the record was insufficient in that it did not include racial compositions of the jury venire and/or final jury.  However, the numbers are stark enough for us to take notice of these patterns and be concerned.

pretextual, but allowed the challenge of a second juror despite the State giving the same reasoning for striking the second juror as the first juror for whose strike pretext was found. The Court stated that, according to the record which shows that the trial court did not know the race of the second juror, "[i]t appears that the trial judge was merely confused over the racial identifications of the jurors involved in the discussion. However, just because the ruling was made inadvertently does not make it any less erroneous."); *Conerly v. State*, 544 So. 2d 1370 (Miss. 1989) (four to three decision, with two justices not participating) (The State struck a black juror, alleging her jury questionnaire was improperly filled out and seemed confusing to her. The trial court explicitly found that her jury questionnaire was properly filled out. The State did not suggest another racially neutral reason for the strike, yet, the trial court allowed the strike. The Court held that "[i]n light of the prosecutor's failure to articulate a valid race-neutral reason for striking Juror Swain, the trial court's factual determination that she was eligible and the case law recited above, we have no alternative but to reverse this case . . . ."). The fifth and final reversal was decided by a plurality. *Flowers v. State*, 947 So. 2d 910 (Miss. 2007). Four justices agreed that a *Batson* violation occurred, requiring reversal. *Id.* at 939. Four justices argued that no *Batson* violation occurred. *Id.* at 941-43 (Smith, C.J., dissenting). One justice argued that the case was not reversible based on the *Batson* issue alone, but that it should be reversed due to cumulative error. *Id.* at 939-41 (Cobb, P.J., concurring in result only). The *Flowers* case in 2007 is the last time this Court has reversed a trial court based on a substantive, versus

procedural,[13] **Batson** issue. This Court "accepts that any pretext will pass for a racially neutral reason for exclusion." **Davis**, 551 So. 2d at 176 (Robertson, J., concurring). "Except a prosecutor dimwittedly confess his discriminatory purpose, or offer no reason at all in support of his strike, he may with impugnity exclude black jurors to the limit of his peremptory challenges." **Id.** (Robertson, J., concurring) (citations omitted).

¶65. Indeed, from the outset of **Batson**, this Court has sought to protect prosecutors while disregarding defendants. When the United States Supreme Court made clear that **Batson** applied retroactively to those defendants whose cases were pending, this Court found that when a defendant had made a prima facie case of discrimination at a pre-**Batson** trial, "the prosecutor had no way of knowing what showing was required of him." **Williams v. State**, 507 So. 2d 50, 53 (Miss. 1987). Thus, "[e]lementary notions of fairness to the State's prosecution interest require that such an opportunity now be afforded," thus requiring remand for **Batson** hearings to allow the prosecution to explain its strikes. **Id.** Yet, when the Court addressed defendants, who likewise had no way of knowing the rights **Batson** would afford them before it handed down, this Court found that a defendant who failed to object to the jury composition had waived his right to assert a **Batson** claim. **Thomas v. State**, 517 So. 2d 1285, 1287-88 (Miss. 1987).

¶66. In the more than thirty years since **Batson** was decided, this Court has simply failed to give **Batson** any teeth whatsoever, all while prosecutors become increasingly savvy in their

---

[13]The only other **Batson** reversal from 2007 to present was a reversal based on the trial court's failure to conduct the third part of the **Batson** analysis on the issue of pretext, even though the defense gave a race-neutral reason for the strike of a white juror. **Hardison v. State**, 94 So. 3d 1092 (Miss. 2012).

28

explanations for strikes that are often wildly disproportionate based on race. That the United States Supreme Court recently had to reverse this Court's findings on a blatant **Batson** violation drives this point home. **Flowers**, 139 S. Ct. 2228.

### 2. Eubanks's case

¶67. With the backdrop of this Court's failure to meaningfully enforce **Batson**, I turn to the case at hand, in which the State used every one of its six peremptory strikes against black potential jurors. In reviewing a **Batson** claim, this Court must review "all of the circumstances that bear upon the issue of racial animosity . . . ." **Snyder v. Louisiana**, 552 U.S. 472, 478, 128 S. Ct. 1203, 170 L. Ed. 2d 175 (2008). I agree with the majority that the strikes on potential jurors one and fourteen were acceptable. *See* **Davis v. State**, 660 So. 2d 1228, 1242 (Miss. 1995). The strike on potential juror two is problematic and, while I agree it does not violate **Batson**, the situation surrounding that strike should be considered in the circumstances examined. The strikes of potential jurors five, six, and nineteen, however, violated **Batson**, and the trial court clearly erred in its finding that these strikes were race-neutral.

¶68. First, the prima facie case of discrimination is strong. The jury venire consisted of thirty-five members, after juror eight was excused for cause during voir dire. Eight of the remaining thirty-five members of the jury venire were African-American. The eight black venire members were all within the first eighteen jurors tendered, and the State was given six peremptory strikes; thus, the prosecution knew that it would have to allow at least two black venire members to be seated on the jury. The jury ultimately included only the minimum of

two black jurors. The strength of the prima facie case is further bolstered by the fact that the prosecution used 100 percent of its strikes on black jurors. "The stronger the *prima facie* case, the more cogent the explanations from the [S]tate and supporting evidence must be and vice versa." ***Mack v. State***, 650 So. 2d 1289 (Miss. 1994). Madison is a majority-white county, and the jury venire was majority-white, as well. *See* American Community Survey, 2018 Census Estimate, available at

https://data.census.gov/cedsci/table?q=%20madison%20county%20mississippi%20educat ional%20attainment&g=0500000US28089&lastDisplayedRow=53&table=S1501&tid=A CSST1Y2018.S1501&t=Educational%20Attainment&layer=county&mode= (last visited Dec. 18, 2019). "The pretense that the prosecutor had in mind racially neutral reasons for striking each and every one of these [six] black potential jurors may but call to mind 'the eerie atmosphere of never-never land' in which a former Attorney General of this state once urged, and a U.S. District Court once found, that Mississippi had no official policy of segregation." ***Davis***, 551 So. 2d at 177 (Robertson, J., concurring). Thus, the State in this case must give stronger explanations and supporting evidence due to the strength of the prima facie case of discrimination.

¶69. Not only is pretext more highly suspected when a strong prima facie case of discrimination exists, it is also more highly suspected in certain situations.

> This Court has identified five indicia of pretext when analyzing proffered race-neutral reason for peremptory strikes under ***Batson***: "(1) disparate treatment, that is, the presence of unchallenged jurors of the opposite race who share the characteristic given as the basis for the challenge; (2) the failure to voir dire as to the characteristic cited; . . . (3) the characteristic cited is unrelated to the facts of the case;" (4) "lack of record support for the stated

30

reason;" and (5) "group-based traits."

*Manning v. State*, 765 So. 2d 516, 519 (Miss. 2000) (quoting *Mack v. State*, 650 So. 2d 1289, 1298 (Miss. 1994)).

a.      *Potential Juror No. 2*

¶70.    While I agree that having been arrested on possession of a controlled substance and DUI is a race-neutral reason for a strike, I raise serious concerns over the trial court's refusal to allow the defense to examine which jurors the State had investigated, and its reliance on unproved outside information. Disparate investigation of black and white potential jurors is an indication of pretext. *Flowers*, 139 S. Ct. at 2243. The defense cannot hope to make a record of disparate investigation when the trial court refuses to allow it to access the investigation to make that record. It also appears to be an abdication of the trial court's responsibility to ensure neutrality, as its refusal disallows anyone from ensuring that the investigation was indeed neutral. Indeed, this Court has cautioned both trial courts and prosecutors against using outside information to strike jurors without allowing the defense to explore that information. We have "remind[ed] trial judges of the danger in failing to allow counsel to place sufficient evidence in the record either proving or rebutting *Batson* issues." *Griffin v. State*, 607 So. 2d 1197, 1203 (Miss. 1992). We have further "caution[ed] prosecutors about using alleged reports of criminal wrongdoing as a basis for striking a juror without substantiating the allegation either through questioning the juror or outside proof." *Id.*

b.      *Potential Juror No. 5*

31

¶71.   The State's explanations for striking potential juror five were that her jury questionnaire was incomplete in that it did not state how long she had worked for her current employer, and because she only had a high school education.  The State explained that it struck many people with high school educations because of "technical testimony" that was expected.  The "technical testimony" expected was in regards to cell phone GPS and pinging technology, which is *not* a widely misunderstood or difficult to understand technology.  In fact, during voir dire, the State asked several questions regarding this expected testimony and asked the jury venire if anyone had a problem with that technology or testimony.  None of the potential jurors indicated having any issues with it.  The State failed to explain why more than a high school diploma was necessary to understand such ubiquitous technology; indeed, every single juror indicated that they owned a cellular phone.  Thus, there is no indication that a having a high school education is related to the facts of the case.  Moreover, the defense pointed out that potential juror five was a research assistant at the Mississippi Department of Health, and was likely competent to understand the technical testimony at issue.  The defense also maintained that the question of how long she had worked for her current employer was a question that the State easily could have asked on voir dire if it had concerns.

¶72.   The prosecutor maintained that he seated juror eighteen, who also had a high school education, because she had worked as a secretary at the University of Mississippi Medical Center for fifteen years, so she could follow technical testimony, as well as because he liked her body language "better."  First, the body language of a different juror should have no

32

bearing on whether juror five was struck. If anything, it indicates that the prosecutor was engaged in an either/or analysis: he knew he had to accept two black jurors,[14] so he picked the ones he liked "best." Liking juror eighteen's body language "better" is not an independent reason to strike juror five. Indeed, the prosecutor's explanation calls to mind the situation in *Foster v. Chatman* in which the prosecutor had indicated which one of the black jurors he would choose if he had to pick one. *See Foster v. Chatman*, 136 S. Ct. 1737, 1744, 195 L. Ed. 2d 1 (2016). Further, the trial court did not itself make an actual finding regarding juror eighteen's demeanor. Thus, this Court need not presume that the trial court credited this explanation. *See Snyder*, 552 U.S. at 479. Because the State's explanations for striking juror five are not related to the facts of the case, could have easily been addressed on voir dire, and indicate that choosing black jurors was an either/or exercise in picking only the minimum number of black jurors necessary, the trial court erred by failing to find pretext.

¶73. I also point out that a savvy prosecutor in Madison County would likely be aware that, or at least have the sense that, African-Americans in Madison County are less likely to attend college than their white counterparts. Approximately 32 percent of African-Americans in Madison County have a bachelor's degree or higher, while approximately 69 percent of white non-hispanics have a bachelor's degree or higher. *See* American Community Survey, 2018 Census Estimate, available at

---

[14]To reiterate, in the first eighteen potential jurors tendered to the State (after for-cause challenges had already been exercised and one juror dismissed for cause), the record reflects that eight were black. A jury consists of twelve jurors. The State had six peremptory strikes. Elemental math leads to the conclusion that the State knew it had to accept two black jurors.

https://data.census.gov/cedsci/table?q=%20madison%20county%20mississippi%20educat ional%20attainment&g=0500000US28089&lastDisplayedRow=53&table=S1501&tid=A CSST1Y2018.S1501&t=Educational%20Attainment&layer=county&mode= (last visited December 18, 2019). The prosecutor's heavy reliance on educational attainment is consequently concerning.

c.      *Potential Juror No. 6*

¶74.    The State alleged that it struck potential juror six because she had a high school education. The defense pointed out that this potential juror was an auto technician at Nissan, which would require a certain degree of skill, and thus the necessary experience to understand cell phone pinging technology. For the same reasons discussed above for juror five, the excuse of high school education lacks a connection to the facts of the case. Furthermore, the State alleged that it did not want to risk that juror six knew juror eight, who was excused for cause because he knew the defendant's mother, because they both worked at Nissan. This excuse is a complete farce. Before the trial court excused juror eight, it *specifically* asked juror eight if he knew anyone else on the jury panel, and juror eight replied that he did not. So the State's "concern" that juror eight may know juror six had already been addressed and did not exist.[15] Because the State's reasoning for striking juror six was clearly pretextual, the trial court erred by failing to seat juror six.

d.      *Potential Juror No. 19*

---

[15]More than 6,400 people work at the Nissan plant, so even had the State's "concern" not already been specifically addressed, the chances that two employees know one another are slim. *See* https://nissan-canton.com/en/about-nissan-canton (last visited Dec. 18, 2019).

¶75.   The State alleged that it excused potential juror nineteen because the prosecutor

alleged she lived in the same apartment complex as a former codefendant's mother, Anita

Pates.  He alleged that Anita Pates had been quite vocal in her displeasure with her son's

case. First, no record support exists for this reasoning: nothing in the record indicates where

Anita Pates lived other than a bare assertion by the prosecutor of where he thought she

lived.[16]  Second, when the trial court asked the jury venire if it had heard of the case at hand,

no one responded in the positive.  The trial court therefore erred by finding that the State's

strike of juror nineteen was not pretextual.

¶76.   When considering all the circumstances bearing on racial animosity, including the

strong prima facie case of discrimination, the failure to allow the defense to make a full

***Batson*** record, the excuses by the State that lacked record evidence, that did not relate to the

facts of the case, and that could easily have been addressed on voir dire, as well as the sham

excuse that had been addressed, the trial court clearly erred in failing to find a ***Batson***

violation for jurors five, six, and nineteen.  For these reasons, I would reverse Eubanks's

conviction and remand the case to the trial court for a new trial.

**KITCHENS, P.J., AND ISHEE, J., JOIN THIS OPINION.**

---

[16]I also note that the apartment complex in which potential juror nineteen lived has nearly six hundred units.
*See*  https://www.apartments.com/the-links-of-madison-county-canton-ms/vhqtmhf/  (last visited Dec. 18, 2019).  Even if Ms. Pates did live in the same complex and did speak to some neighbors, it seems unlikely that she reached all six hundred of them.

**APPENDIX A**

1. *Jones v. State*, 252 So. 3d 574 (Miss. 2018).

2. *Thomas v. State*, 249 So. 3d 331 (Miss. 2018).

3. *Flowers v. State,* 240 So. 3d 1082 (Miss. 2017), *reversed by Flowers v. Mississippi*, 139 S. Ct. 2228, 204 L. Ed. 2d 638 (2019); *Flowers v. State*, 158 So. 3d 1009 (Miss. 2014).

4. *H.A.S. Elec. Contractors, Inc. v. Hemphill Const. Co., Inc.*, 232 So. 3d 117 (Miss. 2016).

5. *Cox v. State*, 183 So. 3d 36 (Miss. 2015).

6. *Hartfield v. State*, 161 So. 3d 125 (Miss. 2015).

7. *McCoy v. State*, 147 So. 3d 333 (Miss. 2014).

8. *Corrothers v. State*, 148 So. 3d 278 (Miss. 2014).

9. *Batiste v. State*, 121 So. 3d 808 (Miss. 2013).

10. *States v. State*, 88 So. 3d 749 (Miss. 2012).

11. *Bailey v. State*, 78 So. 3d 308 (Miss. 2012).

12. *Davis v. State*, 76 So. 3d 659 (Miss. 2011).

13. *Birkhead v. State*, 57 So. 3d 1223 (Miss. 2011).

14. *Pitchford v. State*, 45 So. 3d 216 (Miss. 2010).

15. *Long v. State*, 33 So. 3d 1122 (Miss. 2010).

16. *Booker v. State*, 5 So. 3d 356 (Miss. 2008).

17. *Estate of Jones v. Phillips*, 992 So. 2d 1131 (Miss. 2008).

18. *Pruitt v. State*, 986 So. 2d 940 (Miss. 2008).

19. *Chamberlin v. State*, 989 So. 2d 320 (Miss. 2008).

20. *Strickland v. State*, 980 So. 2d 908 (Miss. 2008).

21. ***Hicks v. State***, 973 So. 2d 211 (Miss. 2007).

22. ***Flowers v. State***, 947 So. 2d 910 (Miss. 2007).

23. ***Mingo v. State***, 944 So. 2d 18 (Miss. 2006).

24. ***Chester v. State***, 935 So. 2d 976 (Miss. 2006).

25. ***Le v. State***, 913 So. 2d 913 (Miss. 2005), *overruled on other grounds*.

26. ***Jones v. State***, 904 So. 2d 149 (Miss. 2005).

27. ***Thorson v. State***, 895 So. 2d 85 (Miss. 2005).

28. ***Johnson v. State***, 875 So. 2d 208 (Miss. 2004).

29. ***Lynch v. State***, 877 So. 2d 1254 (Miss. 2004).

30. ***Branch v. State***, 882 So. 2d 36 (Miss. 2004).

31. ***Gaskin v. State***, 873 So. 2d 965 (Miss. 2004).

32. ***Perkins v. State***, 863 So. 2d 47 (Miss. 2003).

33. ***Howell v. State***, 860 So. 2d 704 (Miss. 2003).

34. ***Burnett v. Fulton***, 854 So. 2d 1010 (Miss. 2003).

35. ***Minor v. State***, 831 So. 2d 1116 (Miss. 2002).

36. ***Smith v. State***, 835 So. 2d 927 (Miss. 2002).

37. ***Horne v. State***, 825 So. 2d 627 (Miss. 2002).

38. ***Catson v. State***, 823 So. 2d 473 (Miss. 2002).

39. ***Walker v. State***, 815 So. 2d 1209 (Miss. 2002).

40. ***Thomas v. State***, 818 So. 2d 335 (Miss. 2002).

41. ***Mills v. State***, 813 So. 2d 688 (Miss. 2002).

42. *Hicks v. State*, 812 So. 2d 179 (Miss. 2002).

43. *Randolph v. State*, 852 So. 2d 547 (Miss. 2002).

44. *Hubbard v. State*, 819 So. 2d 1192 (Miss. 2001).

45. *Weeks v. State*, 804 So. 2d 980 (Miss. 2001).

46. *Carter v. State*, 799 So. 2d 40 (Miss. 2001).

47. *Berry v. State*, 802 So. 2d 1033 (Miss. 2001).

48. *Drake v. State*, 800 So. 2d 508 (Miss. 2001).

49. *Snow v. State*, 800 So. 2d 472 (Miss. 2001).

50. *Stevens v. State*, 806 So. 2d 1031 (Miss. 2001).

51. *Johnson v. State*, 792 So. 2d 253 (Miss. 2001).

52. *Puckett v. State*, 788 So. 2d 752 (Miss. 2001).

53. *Williams v. State*, 794 So. 2d 181 (Miss. 2001), *overruled on other grounds*.

54. *Overstreet v. State*, 787 So. 2d 1249 (Miss. 2001).

55. *Baldwin v. State*, 784 So. 2d 148 (Miss. 2001).

56. *Manning v. State*, 765 So. 2d 516 (Miss. 2000).

57. *Davis v. State*, 767 So. 2d 986 (Miss. 2000).

58. *Gary v. State*, 760 So. 2d 743 (Miss. 2000).

59. *Humphrey v. State*, 759 So. 2d 368 (Miss. 2000), *superceded by rule on other grounds*.

60. *Webster v. State*, 754 So. 2d 1232 (Miss. 2000).

61. *Jasper v. State*, 759 So. 2d 1136 (Miss. 1999).

62. *McGilberry v. State*, 741 So. 2d 894 (Miss. 1999).

63. *Edwards v. State*, 737 So. 2d 275 (Miss. 1999).

64. *Baldwin v. State*, 732 So. 2d 236 (Miss. 1999).

65. *Taylor v. State*, 733 So. 2d 251 (Miss. 1999).

66. *Fleming v. State*, 732 So. 2d 172 (Miss. 1999).

67. *Berry v. State*, 728 So. 2d 568 (Miss. 1999).

68. *Finley v. State*, 725 So. 2d 226 (Miss. 1998).

69. *Gibson v. State*, 731 So. 2d 1087 (Miss. 1998).

70. *Sewell v. State*, 721 So. 2d 129 (Miss. 1998).

71. *Magee v. State*, 720 So. 2d 186 (Miss. 1998).

72. *Walters v. State*, 720 So. 2d 856 (Miss. 1998).

73. *Brewer v. State*, 725 So. 2d 106 (Miss. 1998).

74. *Manning v. State*, 726 So. 2d 1152 (Miss. 1998), *overruled on other grounds*.

75. *Randall v. State*, 716 So. 2d 584 (Miss. 1998).

76. *Booker v. State*, 716 So. 2d 1064 (Miss. 1998).

77. *Woodward v. State*, 726 So. 2d 524 (Miss. 1997).

78. *McFarland v. State*, 707 So. 2d 166 (Miss. 1997).

79. *Lester v. State*, 692 So. 2d 755 (Miss. 1997), *overruled on other grounds*.

80. *Simon v. State*, 688 So. 2d 791 (Miss. 1997).

81. *Collins v. State*, 691 So. 2d 918 (Miss. 1997).

82. *Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

83. *Walker v. State*, 671 So. 2d 581 (Miss. 1995).

84. *Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

85. *Carr v. State*, 655 So. 2d 824 (Miss. 1995).

86. *Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

87. *Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

88. *Harper v. State*, 635 So. 2d 864 (Miss. 1994).

89. *Chase v. State*, 645 So. 2d 829 (Miss. 1994).

90. *Hatten v. State*, 628 So. 2d 294 (Miss. 1993).

91. *Simon v. State*, 633 So. 2d 407 (Miss. 1993).

92. *Dedeaux v. J.I. Case Co., Inc.*, 611 So. 2d 880 (Miss. 1992).

93. *Griffin v. State*, 610 So. 2d 354 (Miss. 1992).

94. *Griffin v. State*, 607 So. 2d 1197 (Miss. 1992).

95. *Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

96. *Abram v. State*, 606 So. 2d 1015 (Miss. 1992), *overruled on other grounds*.

97. *Bush v. State*, 597 So. 2d 656 (Miss. 1992).

98. *Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

99. *Govan v. State*, 591 So. 2d 428 (Miss. 1991).

100. *Willie v. State*, 585 So. 2d 660 (Miss. 1991), *overruled on other grounds*.

101. *Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

102. *Turner v. State*, 573 So. 2d 657 (Miss. 1990).

103. *Bradley v. State*, 562 So. 2d 1276 (Miss. 1990).

104. *Sudduth v. State*, 562 So. 2d 67 (Miss. 1990).

105. *Dennis v. State*, 555 So. 2d 679 (Miss. 1989).

106. *Benson v. State*, 551 So. 2d 188 (Miss. 1989).

107. *Davis v. State*, 551 So. 2d 165 (Miss. 1989).

108. *Conerly v. State*, 544 So. 2d 1370 (Miss. 1989).

109. *McDonald v. State*, 538 So. 2d 778 (Miss. 1989).

110. *Wheeler v. State*, 536 So. 2d 1347 (Miss. 1988).

111. *Chisolm v. State*, 529 So. 2d 635 (Miss. 1988).

112. *Goggins v. State*, 529 So. 2d 649 (Miss. 1988).

113. *Chisolm v. State*, 529 So. 2d 630 (Miss. 1988).

114. *Dedeaux v. State*, 528 So. 2d 300 (Miss. 1988).

115. *Johnson v. State*, 529 So. 2d 577 (Miss. 1988).

116. *Taylor v. State*, 524 So. 2d 565 (Miss. 1988).

117. *Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).